MEMORANDUM OPINION[1] AND ORDER
KENT LINDQUIST, Chief Judge.
I
Statement of Proceedings
The Debtors filed their petition commencing their case on July 3, 1986. On July 7, 1986, the Plaintiffs herein, George Joseph Greives, Jr. and Janet Ann Greives (hereinafter: “Debtors” or alternatively George Joseph Greives, Jr, “Greives”) filed their complaint praying that a turnover order issue versus the Defendant, Bank of Western Indiana (hereinafter: “Bank”), as to certain farm machinery and livestock pursuant to 11 U.S.C. § 542 or in the alternative § 543. The Debtors further alleged that they could provide adequate protection as the Court deemed necessary by periodic payments to the Bank pursuant to 11 U.S. C. § 361.
The Debtors’ complaint asserts that the Bank obtained a pre-judgment order of possession in the Circuit Court of Warren County, Indiana, under Cause No. 86-C-72 on June 25, 1986, or prior to the Debtors’ petition, as to certain equipment and livestock in which the Bank claims a security interest, that the Debtors had a right to use, sell or lease the same pursuant to 11 U.S.C. § 363, are necessary to the Debtors’ rehabilitation, and are of consequential value.
Pursuant to the Debtors’ motion for emergency hearing for turnover of said property on July 7, 1986, the Court, after holding an emergency hearing on July 10, 1986, ordered the Bank to turnover and deliver all property physically in the possession of the Bank to the Debtors upon the payment of $1,000.00 by the Debtors to the Bank as interim adequate protection to the Bank, together with delivery by the Debtors to the Bank of written proof of insurance of the property in an amount no less than $200,000.00. The Order also prohibited the Debtors from selling, transferring or disposing of the same and granting the Bank the right to physically inspect the same.
In that same order the Court set down the proceeding for a pre-trial conference as to what adequate protection, if any, should be provided by the Debtors to the Bank pursuant to 11 U.S.C. § 361. No formal, written motion requesting adequate protection was filed by the Bank, as this contested matter arose out of the Debtors’ complaint for turnover.
On July 25, 1986, the Debtors filed their answer and affirmative defenses to the re *916 quest by the Bank for adequate protection alleging as follows:
1. That for purposes of adequate protection pursuant to 11 U.S.C. Sec. 361 and 11 U.S.C. Sec. 506, the value of the farm machinery and equipment secured by Bank of Western Indiana is $57,000.00 and the value of the livestock is only $43,000.00 since the livestock’s value is based on current slaughter price, not sold as breeding stock due to the quarantine of the livestock two years before.
2. That Bank of Western Indiana has failed to perfect a security interest in a lawsuit filed against Gary Greenwood, D.V.M., et al., pending in Marion Superior Court, Case No. S582-1598 since Bank of Western Indiana failed to file a U.C.C. Financing Statement pursuant to securing claim for malpractice and breach of contract.
3. That Bank of Western Indiana failed to obtain a security interest in the 1986 crop since the Security Agreement does not set forth the 1986 crop as secured property nor is there a writing in existence acknowledging Bank of Western Indiana’s secured interest by the Debtors.
4. That Bank of Western Indiana has a second mortgage on real estate, the value of which is less than the debt due John Hancock Life Insurance, the first Mortgagee.
5. That the cattle will not depreciate and that no further adequate protection is required except to grant a security interest, post-petition in the livestock to the extent of value upon the filing of the petition pursuant to 11 U.S.C. Sec. 552 and for the farm machinery and equipment to the extent of actual depreciation for a reasonable period and lost reinvestment opportunity.
The Court set the final evidentiary hearing on the Bank’s request for adequate protection for August 21, 1985. On the motion of the Bank, the same was continued to September 24, 1986 at which time a partial submission was made. The hearing was adjourned to October 16, 1986 for an additional partial submission and again adjourned to November 3,1986, at which time submission was fully made.
By letter dated November 21, 1986, with enclosures, filed with the Court in November 1986, with a copy shown to Debtors’ counsel, the Bank submitted two documents to the Court. The first was an agreed entry in which the Debtors agreed that in lieu of adequate protection payments to abandon to the Bank a 42 foot 1972 Wilson trailer, serial no. 5639, in which the parties agreed that the Bank has a security interest pursuant by virtue of a security agreement dated July 18, 1985, executed by the Debtors in favor of the Bank. The Bank agreed to dispose of said trailer in accordance with the Indiana UCC and apply the net proceeds therefrom to the indebtedness of the Debtors to the Bank. It was further agreed by the parties that this trailer was not included in the stipulated value of $63,500.00 for the non-titled equipment of the Debtors.
Per the instructions of the Court, at the hearing held on November 3, 1986, the Bank by letter dated November 21, 1986 submitted a market report as to the value of the 1979 Chevrolet truck to which value had not been agreed upon by the parties. The market report shows a value of $3,200.00 as a base price without options and accessories. This market report was by National Market Reports, Inc., Vol. 76, No. 4 dated October 1, 1986.
There was some confusion at the beginning of the hearing as to whether Farmers and Merchant’s Bank claimed a security interest in the Debtors’ equipment which was senior to that of the Bank. By letter dated November 7, 1986, the Bank filed a certified copy of a UCC termination statement filed by the Farmers and Merchant’s Bank with the Warren County Recorder on October 8, 1986 as to the Debtors’ equipment.
On November 17, 1986 the Debtors filed their post-hearing, legal memorandum in which they assert that the Debtors granted the Bank a security interest in the specific machinery (equipment) set forth in the list attached to the November 19,1985 Security *917 Agreement, in only the specific typewritten list of cattle signed by the Debtors as set out in the July 18, 1985 list attached to the November 19, 1985 Security Agreement, and in the 1985 crop, but not the 1986 crop. The Debtors admitted in their memo that the Bank had a valid security interest in titled equipment (i.e. vehicles) where title is retained by the Bank or set forth on the title, as well as a valid mortgage as to the Debtors’ real estate.
On November 24,1986, the Bank filed its post-trial brief asserting that the Bank has a valid security interest in the following property: 1) the proceeds of a lawsuit by the Debtors versus a Dr. Greenwood and others; 2) farm equipment owned by the Debtors and certain titled vehicles owned by George Greives, Jr.; 3) all cattle owned by the Debtors; and 4) the Debtors’ 1986 crops.
II
Findings of Fact
The parties orally stipulated in open Court or at status conference to the following findings of facts for the purpose of this hearing only:
1. That the Bank has a valid and properly perfected security interest in certain non-titled equipment and that the value thereof is $63,500.00. (The Debtors would not stipulate however as to the priority of the lien of the Bank as to certain, undesignated farm equipment that the Debtors purchased from John Deere Company pursuant to a purchase money security interest).
2. That the Bank also has a valid and properly perfected security interest in three titled vehicles. A 1972 Wilson trailer, a 1976 Buick Electra automobile and a 1979 Chevrolet truck. (The 1972 Wilson trailer was subsequently abandoned by the Debtors to the Bank, supra.)
3. That the value of 40 cattle presently owned by the Debtors in which the Bank asserts a security interest has a value of $30,000.00.
4. That as of the date of the Debtors’ petition commencing this bankruptcy they were indebted to the Bank in the sum of $370,716.12 principal and accrued interest and that the per diem thereon is $135.49.
5. That the UCC-11 “request for information copies” done by the Plaintiff as to the Debtor with the Recorder of Warren County, Indiana is a true and correct statement of the UCC filings made versus the Debtors and is admitted into evidence as Defendant’s exhibit no. 29.
6. That in addition, those documents marked Defendant’s exhibits 1 through 30 for identification are authentic and genuine and are admitted into evidence as Defendant’s exhibits 1 through 30.
The Debtors expressly refused to stipulate that the Bank holds a valid security interest in the Debtors’ 1986 crops and the proceeds thereof or what the ultimate value of that crop is or that the Bank has a valid security interest in any and all of the Debtors’ cattle.
The Bank’s initial witness was Dan Feh-renbach, the Bank’s vice president in charge of lending.
Fehrenbach testified that on November 19, 1985, the Debtors executed to the Bank their most recent renewal note in the sum of $338,000.00. (Defendant’s Exhibit No. 1). The note was on the Bank’s own pre-printed form with appropriate blanks to be filled in as required. The note had attached thereto an “obligatory and/or discretionary line of credit agreement”, also dated November 19, 1985, signed by Debtors and Fehrenbach on behalf of the Bank. This agreement was also on the Bank’s pre-printed form with appropriate blanks to be filled in as required.
The relevant portion of the November 19, 1985, note provided as follows:
*918 [[Image here]]
The relevant portion of the obligatory and/or discretionary line of credit agreement dated November 19, 1985 which was attached to the above note is reproduced below:
*919 [[Image here]]
Fehrenbach stated that on November 19, 1985, the Debtors executed a security agreement in favor of the Bank. (Defendant's Exhibit No. 19). The security agreement was again on the Bank’s own pre-printed form with appropriate blanks to be filled in as required. The front page of the security agreement is reproduced below:
*920 [[Image here]]
*921 The Debtors’ signatures were affixed thereto at the bottom of the page. It is noted that the first two boxes in clause l.(b), the first box in clause l.(c), and the box in clause l.(d) are all typed in with an “XX”. Clause 1(b) after the second box has typed in on the first line, the following language, “see attached lists”.
The “attached lists” referred to on the face of the security agreement are really not “lists”, but additional documents annexed thereto by staple at the time they were submitted into evidence by the Bank. What “lists” or documents are in fact attached cannot be discerned from referring to the first page of the November 19, 1985 security agreement, nor do the attached documents or “lists” stapled to the security agreement refer to the first page of the November 19, 1985 security agreement to which they are attached. Thus, the “lists” or attachments cannot on their face be found to be incorporated by reference into the security agreement just as the security agreement on its face does not specifically incorporate the attached documents or lists by reference. Only from the fact that they are physically stapled together at the time of submission could one construe that these various attachments possibly form one integrated legal instrument.
The first unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is a pre-printed form labeled “crop program for 86”, which is dated November 19, 1985. This document shows the Debtors as borrowers, and has an estimated total crop income typed in of $93,875.00. It is not signed by either party. This attachment or document is reproduced in full as follows:
*922 [[Image here]]
The second unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is an “agreement” dated July 18, 1985, executed by the Bank and the Debtors. That agreement is reproduced in full as follows:
*923 [[Image here]]
*924 The third unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is entitled “George J. Greives, Jr equipment listing” and is a typed, two-page, list of equipment. The second page thereof has hand written at the bottom, “the above listed equipment is being pledged to the Bank of Western Indiana to secure the undersigned indebtedness” and is signed and dated July 18, 1985 by both Debtors.
The fourth unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is a pre-printed form entitled “crop program for 1985”, which is signed and dated July 18, 1985 by the Debtors at the bottom thereof, has typed in the names of the Debtors as borrowers and shows an estimated total crop income of $51,850.00. This attachment or document is reproduced herein as follows:
[[Image here]]
*925 The fifth unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is a typewritten list of cattle consisting of two pages, the first page of which has language handwritten at the bottom followed by the Debtors’ signatures and a July 18, 1985 date, while the second page is a typewritten list which has no handwriting thereon and does not refer to the first page, nor does the first page refer to the second page. This attachment is reproduced below:
*926 [[Image here]]
*927 [[Image here]]
The sixth unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is a four-page, computer printout entitled “Herd Inventory record — American Hereford Association” showing the “Breeder” as “George J. Greives, Jr. and family” and is dated May 21, 1985. Many of the cattle which are individually listed therein have either handwritten circles around, X’s next to, or lines drawn through, the herd identity number for the particular cow, calf or cattle listed.
At the bottom of the first page of the sixth attachment is the following handwritten language together with the signature of the Debtors and which is dated July 18, 1985:
*928 [[Image here]]
The Seventh, unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is a typewritten document entitled “assignment of lawsuit proceeds” signed by the Debtors and dated July 18,1985, whereby the Debtors purported to assign any and all proceeds of a certain lawsuit in which the Debtors were the Plaintiffs under Marion County Superior Court Room No. 5 Cause Number S582-1598.
The eighth, unnumbered, attachment or document (or “list” as referred to in the face of the security agreement) is again a typewritten document entitled “assignment of loan proceeds” which appears to replicate attachment or document seven with some slight variations and where certain changes therein are initialed by the Debtors.
The ninth unnumbered attachment or document (or “list” as referred to in the *929 face of the security agreement) is an unsigned UCC-1 financing statement, filing officer copy — acknowledgement, which shows the recording stamp of the Warren County Recorder dated December 27, 1985, as number 7633, together with an unstamped UCC-1 financing statement, secured party copy, which repeats the same language but which is unstamped and apparently signed by a Bank representative only (December 27, 1985 would be some 39 days after the security agreement was executed and yet the UCC-1 is shown as attached to the November 19, 1985 security agreement which the Debtors signed). These UCC-1 forms are reproduced in full as follows:
[[Image here]]
*930 The tenth and last unnumbered attachment or document (or “list” as referred to in the face of the security agreement) is an unsigned UCC-1 financing statement, filing officer copy-acknowledgement, which was filed on December 80, 1985, with the Indiana Secretary of State as document number 1212592 (December 30, 1986 was 51 days after the security agreement was executed and yet the UCC-1 is attached to the November 19, 1985 security agreement which the Debtors signed), together with an unfiled or unstamped “secured party copy” of a UCC-1 containing the identical language which reflects the signature of the Bank only as secured party. These UCC-1 forms are reproduced in full as follows:
[[Image here]]
*931 Fehrenbach stated the Bank originally made a loan to the Debtors in the spring of 1982, and in July of 1985 the Bank advanced an additional $150,000.00 to the Debtors to forestall a foreclosure action by John Hancock Mutual Life Insurance Company (hereinafter: “Hancock”). The loan was last renewed by the November 19, 1985 note (Defendant’s exhibit no. 1).
Fehrenbach further recited that the July 18, 1985 note was to mature in November of 1985, and the Bank had anticipated at that time there would be a cattle auction by the Debtors and some of the proceeds therefrom would be applied to reduce the balance due on the note, and that upon the payment of a “specific sum of money” the Bank’s liens against the cattle and various other assets of the Debtors would be released. Fehrenbach stated that the sale proceeds were not sufficient to meet the Bank’s minimum figure and thus the Bank needed to either renew the note or “deal with it”.
Fehrenbach related that he believed on November 13, 1985 he visited the Debtors farm and picked up three checks that represented the proceeds of the Debtors’ 1985 crop that were issued by Commodity Credit Corp. which were then applied by the Bank to the July, 1985 note.
Fehrenbach asserts that at the time he picked up the checks from Mr, Greives he had a discussion as to what would be planted as the 1986 crop, and Mr. Greives provided him with estimates as to the types of crop, yields, and estimated market value. He further asserted that the Debtors knew that there would be no renewal of the note unless the 1986 crop was given as additional collateral, and that although the Debtors objected to this Greives stated that it didn’t matter as the Bank would be paid from the proceeds of the Debtors’ pending lawsuit. (Tr. 11/13/86, p. 16, LL. 24-25; p. 17, LL. 1-6). Fehrenbach stated that this information was “transferred to the attachment” (Tr. 9/24/86, P.13, LL. 21-22) and “submitted” with the November 19,1986 security agreement (Tr. 9/24/86 P.13, LL. 23-25). (See, first unnumbered attachment or document to Defendant’s exhibit no. 19, the November 19, 1985 security agreement reproduced in full, supra).
Fehrenbach stated that he was present when said security agreement was executed by the Debtors and he saw them sign the same. He further related that all of the attachments (“lists”) to the security agreement were attached at that time (Tr. 9/24/86, P. 13, LL. 4-9) except the 1986 UCC-1 filings relating to the 1986 crops as they have a file-stamped date thereon after the date of the security agreement, and that the UCC-1 statements were subsequently attached after they were filed “because its part of the transaction.” (Tr. 9/24/86, P. 13, LL. 1-2).
When asked why he had the Debtors sign a UCC-1 financing statement as to the 1985 crop and not as to the 1986 crop, Fehrenbach stated that he did not have those forms with him at the time and that the security agreement gave the Bank the authority to file UCC financing statements without the Debtors’ signatures anyway, although it was the standard practice of the Bank to have the Debtors sign the UCC financing statement. (Tr. 11/3/86, P. 17, LL. 15-25, P. 18, LL. 1-10).
Fehrenbach stated he presented the Debtors with the November 19, 1985 note and security agreement, obligatory line of credit, the commitment letter, and all of the attachments which were reviewed by the Debtors.
Fehrenbach was queried by the Debtors as to why the various documents were attached to the November 19, 1985 security agreement, when the first page thereof had standard printed language granting the Bank a blanket security interest in all of the Debtors’ livestock.
Fehrenbach explained that the Bank’s word processor had limited capability and cannot provide the detail desired with respect to certain collateral such as equipment or livestock. He added that the purpose of the attachment as specific equipment or livestock was to “include but not limited to the items shown” (Tr. 9/24/86, p. 26, L. 6), although he admitted no such language could be found in the security agreement.
*932 Fehrenbach stated that although the first unnumbered attachment or document to the November 19, 1985 security agreement was the Bank’s form captioned “Crop Program for 1986”, and showed the Debtors as “borrowers”, it was not signed by the Debtors as the Bank had a lien on the 1986 crops based on the general language at paragraph l.(b), box two of the first page of the printed form, which granted the Bank a security interest in “all farm proceeds of the Debtors now owned or hereafter acquired, including but not limited to ... all crops, ...”
Fehrenbach was then asked by Debtors’ counsel to examine Defendant’s exhibit no. 2 which is a letter by Fehrenbach on behalf of the Bank to the Debtors dated November 19, 1985 in which the Bank informed the Debtors that it was renewing its line of credit on certain terms as set out therein. The letter is set out below:
*933 [[Image here]]
*934 [[Image here]]
The above signature blocks do not have the Debtors’ signatures affixed thereto by which they accepted the terms and conditions thereof.
Fehrenbach stated he saw no reason to have the Debtors sign the commitment letter as set out above as the November 19, 1985 note in the lower left hand comer thereof in a section denominated “Security”, states that the note is secured, among other things by; “Security Agreements dated 7/18/85 (cattle machinery growing crops titled vehicles) ... Security Agreement dated 11/19/85 (crops)”, and that this was also spelled out in the “Obligatory and/or Discretionary Line of Credit Agreement”, executed by the parties on November 19, 1985. (The Court notes that the last half of the word “Agreement” and the words immediately thereafter, “dated 11/19/85 (crops)” were apparently typed in with a different typewriter).
Under that section of the November 19, 1985 note denominated “conditions” after the printed form words “The conditions for future advances are ...” is typed in the *935 words, “IN ACCORDANCE WITH THE LETTER DATED 11/19/85 AND AT THE DISCRETION OF BANK MANAGMENT”.
Physically stapled to said note, although not incorporated by reference into the note, is a printed form titled, “Obligatory and/or Discretionary Line of Credit Agreement,” dated November 19, 1985, to which the signatures of Fehrenbach on behalf of the Bank and those of the Debtors are affixed thereto. The relevant portions are reproduced below:
[[Image here]]
*936 The Court notes that in Section 3 thereof, “RELATED DOCUMENTS:” box one refers to the security agreements dated July 18, 1985 and November 19, 1985, and that the type as to the words “& November 19, 1985” is different than the type in the rest of that document. It is not clear if this was typed in before or after the credit agreement was signed; however, it seems improbable it would have been typed in before it was executed by using two different typewriters.
Fehrenbach advised that he drove out to the Debtors’ farm on the night of November 19,1985 and had them sign the November 19, 1985 security agreement. When asked if he advised the Debtors if they knew they were granting the Bank a security interest in their 1986 crops, even though the Bank would be advancing no monies for the 1986 crop, he stated he so advised the Debtors. When asked how the Bank expected the Debtors to obtain monies for the input expenses for the 1986 crops, Feh-renbach stated that both the Bank and the Debtors anticipated that the Debtors would receive a large sum from a lawsuit they had pending.
Fehrenbach also referred to the notes of the Bank’s loan committee (Defendant’s exhibit no. 22) dated November 19, 1985 at page two, item 2, where the loan committee expressly stated that a condition for renewal of the note was that the Debtors grant the Bank a security agreement in “100% of the 1986 crops as replacement collateral”, and page one thereof which recites that Fehrenbach had discussed the Debtors’ crop projections for 1986 with the Debtors on his November 13, 1986 visit to the farm.
Fehrenbach was asked if the Debtors objected to the provisions in the November 19,1985 committment letter, which they did not sign as to the 1986 crops. Fehrenbach stated that Mr. Greives registered no objections to the requirement relating to the 1986 crops, but did object to the item regarding the proposed allocation of the proceeds of the sale of certain cattle between the Debtors’ expenses and the reduction of the Bank’s debt.
As to the cattle, in which the Bank claims a security interest, Fehrenbach testified that the attachment as to the cattle was based on the list provided to the Bank by the Debtors in July of 1985, and which was originally attached to the July 18, 1985 security agreement (Defendant’s Exhibit no. 9).
Fehrenbach stated that the attachments to the July 18, 1985 security agreement were stapled to the security agreement after it was signed at the closing on July 18, 1985, and he was not certain if the Debtors had the July 18, 1985 security agreement with all attachments stapled thereto when he left the closing or not but that “he would have had a copy of each one of those documents” (Tr. 11/3/86, P.5, LL.4-15).
The procedure at the July 18, 1985 closing per Fehrenbach, was that copies of each page of the document that eventually became a “list” or attachment to the security agreement was stacked up separately on a table for execution.
When Fehrenbach was asked whether on November 19, 1985 he explained to Mr. Greives that even though the attachment to the November 19, 1985 security agreement related to a specific list of cattle, which was also used as an attachment to the July 18, 1985 security agreement, the Debtors also orally agreed to generally collateralize all of their cattle, as set out on the front page of the printed security agreement, Fehrenbach responded in the negative. He stated however, that the scope of the first page of the printed security agreement was a blanket one on all of the Debtors’ cattle then owned or hereafter acquired, which was carefully explained in detail to the Debtors by the Bank’s attorney over a two hour period at the July 18, 1985 closing prior to the execution of the July 18, 1985 security agreement.
Fehrenbach later on cross-exam related that when he went out to the Debtors’ house on November 19, 1985, there were no attachments actually physically annexed to the November 19, 1985 security agreement when executed by the Debtors, but that he had copies of the attachments to the July 18, 1985 agreement with him *937 which he showed to the Debtors (Tr. 11/3/86, P.12, LL.16-24; P.14 LL.22-25; P.15, L.l; P.16, LL.9-13). CF. Fehren-bach’s testimony on direct exam when he related they were attached when signed except the UCC-1 statements. (Tr. 9/24/86, P.12, LL.4-16; P.13, LL.4-9). The attachments that were subsequently made to the November 19, 1985 security agreement by the bank were copies of the attachments to the July 18, 1985 security agreement which was signed by the Debtors at the July 18, 1985 closing, except that the unsigned Bank form relating to the 1986 crops was also included as an additional attachment to the November 19,1985 security agreement. (Tr. 11/3/86, P.12, LL.21-25; Tr. 11/3/86, P.13, LL. 1-15).
Fehrenbach stated that although the Debtors refused to sign the November 19, 1985 committment letter referred to in the November 19, 1985 note, he did advise them that the Bank wanted a lien on the 1986 crops to which the Debtors acceded as they thought the proceeds of the lawsuit would entitle them to reduce the Bank debt and obtain a release of the Bank’s lien.
After the Debtors signed the November 19, 1985 printed security agreement, without attachments, Fehrenbach related he took all the separate papers i.e. the November 19, 1985 note and security agreement and proposed attachments back to the Bank, and attached those documents with a staple to the November 19, 1985 security agreement which are referred to as “See attached lists” on the first page of the printed form. He could not recall if a copy of the security agreement with all of the attachments stapled thereto was ever given to the Debtors thereafter. (Tr. 11/3/86, P. 16, LL. 9-16). He stated that he did not have the Debtors sign a UCC-1 financing statement for the 1986 crops as he did for the 1985 crops as he did not have one with him and the security agreement gave the Bank the authority to file the same without the Debtors’ signatures anyway. This testimony as to when the attachments were in fact physically annexed conflict with Feh-renbach’s own previous testimony when he testified that all of the documents except the UCC-1 was attached to the November 19, 1985 security agreement when the Debtors executed the same.
The Bank had admitted into evidence by stipulation with the Debtors that which is now denominated as Group Exhibit No. 35 (erroneously referred to by the Court as Defendant’s Group Exhibit No. 31 in the record (Tr. 9/24/86, P. 24, LL. 4-5).
The group exhibit was, among other things, comprised of the following:
1. Real estate mortgage foreclosure complaint filed by Hancock as mortgagee versus Debtors as mortgagors as to the Debtors’ real estate, with the Bank named as a party defendant as second mortgagee under Warren County Circuit Court Cause No. 86C55 on April 24,1986. The complaint prays for a money judgment in the principal sum of $430,000.00 plus accrued interest and advances. The Bank and the Debtors stipulated that for the purposes of this hearing, Hancock had a real estate mortgage on the Debtors’ real estate that was senior to that of the Bank, and that the balance due to Hancock would be computed by the figures set out in the Hancock complaint.
2. Replevin complaint filed by Bank in the Warren County Circuit Court under Cause No. 86-C-72 praying for a replev-in judgment versus the Debtors based upon the November 19, 1985, security agreement (Exhibit “B” to complaint; Defendant’s Exhibit No. 19, supra). The complaint also prays for a money judgment in the sum of $336,679.00 plus interest at the rate of 14% per annum from November 19, 1985 based upon the Debtors’ promissory note dated November 19, 1985.
3. Prejudgment Order of possession entered by the Warren Circuit Court under Cause No. 86-G-72 on June 25, 1986, based on the Bank’s replevin complaint, as set out above, in which the Warren County sheriff was ordered to seize the cattle and equipment as set out in the November 19, 1985 security agreement.
Fehrenbach stated that the Bank’s overall, annualized rate of return on monies lent is 11.295%. He also stated that its *938 short-term returns are 5.652% on federal funds and 6.356% on bankers’ acceptances, and that the Bank’s combined return for both investments and loans is 10.501 percent.
Fehrenbach added that it would probably take the Bank sixty days from the date of repossession to sell the Debtors’ equipment at public auction. As to the crops, he testified that the Bank could liquidate them on the eleventh day (i.e. after the standard ten day notice usually given to the debtor by the Bank pursuant to the Indiana UCC), as the crops would be transported to a local elevator and sold. As to the purebred cattle, Fehrenbach stated that they could be disposed of by private treaty sale in two weeks to a month, but that if a public auction was employed it would take close to two months.
As to the Debtors’ real estate, Fehren-bach ventured that there was a 65 to 75 percent chance it would only take the Bank two or three months after obtaining title at sheriff’s sale to dispose of the same based on his conversation with one Mark A. Jones, a real estate appraiser, and that a real estate broker would probably be engaged.
In discussing the expenses of sale, Feh-renbach noted that the Bank would have the cost of feeding the animals while they were in the Bank’s possession, a transfer fee of $3.00 to $10.00 would have to be paid, as well as $200.00 to $300.00 in attorneys’ fees for document preparation, etc.
As to the crops, Fehrenbach stated a custom harvester would have to be hired at approximately $15.00 per acre. In addition, there would be the cost of transporting the same to the elevator.
As to the equipment, Fehrenbach projected a five percent commission for an auctioneer plus another three percent for repairs and cleaning for an approximate overall sale expense of eight percent.
Fehrenbach stated that he estimated the useful life of the equipment as being from seven to ten years. As to the cattle they would eventually lose market value as their age increased but had no specifics. He did acknowledge that if the cattle were to remain in the Debtors’ possession over the short term, i.e. three or four months, they could actually increase in value.
The Bank also called Alvin J. Katzman as its witness. Katzman testified he was an attorney, and that he formerly represented the Bank regarding the Bank’s loan transaction with the Debtors.
Katzman testified that when John Hancock Insurance Company (hereinafter: “Hancock”) commenced a foreclosure action on the Debtors’ real estate upon which the Bank held a second mortgage junior to Hancock, he started negotiations with attorney Frederick Hoffman who represented the Debtors at the time. The focal point of the negotiations was whether the Bank would advance the monies necessary for the Debtors to reinstate the Hancock mortgage and obtain a dismissal of its foreclosure suit.
Per Katzman, the Bank took the position that if it should advance such funds the Bank wanted as additional collateral for its loan all of the Debtors’ equipment and all of their cattle. Katzman stated, the Debtors initially refused this request.
By letter dated April 23, 1985 the Debtors’ counsel, attorney Hoffman offered to grant the Bank a security interest in “all of their cattle which they are going to sell at public auction on September 15, 1985. They are going to be selling 50 or more head.” (Defendants’ Group Exhibit No. 32).
Katzman advised that the Debtors gave the Bank a list of cattle that they would be willing to offer as additional collateral, but that after reviewing the same the Bank did not feel that the list of cattle was sufficient and by letter dated June 5, 1985 attorney Katzman advised attorney Hoffman that an additional “35 pair of cattle would be needed as security for the loan.” (Defendant’s Group Exhibit No. 32).
By letter, dated June 14, 1985, attorney Katzman advised attorney Hoffman that since the Debtors had not offered sufficient collateral to secure the funds requested, the Bank had decided not to make the loan.
*939 Katzman stated that attorney Hoffman then called him in response to the June 14, 1985 letter, and asked if the Bank would reconsider its position. Katzman further stated he had a phone conversation with the Bank regarding the terms of the loan after the phone call from attorney Hoffman on June 27, 1985, and subsequent thereto he received a letter dated June 28, 1985 from the Bank spelling out the details of any additional extension of credit by the Bank to the Debtors, and that this letter expressly provided that the Debtors had to collateralize all of their cattle in order for the loan to be consummated. (Defendant’s Exhibit No. 32). That letter is reproduced below:
[[Image here]]
*940 [[Image here]]
*941 [[Image here]]
Katzman declared he then called attorney Hoffman who stated he would take up the matter with the Debtors and get back to him. Katzman could not recall whether he then received a call from attorney Hoffman or the Debtors directly, but in any event, the Debtors signified their assent to the terms of the June 28, 1985 letter, supra.
The closing was held on July 18, 1985, and on that date the Debtors signed a security agreement to further secure the additional advance made by the Bank to cure the Debtors’ default on their mortgage to Hancock. . (Defendant’s Exhibit No. 9).
Katzman further related that the Debtors provided the Bank with the “T.P.R.” computer listing of cattle on the same day as the closing prior to the completion of the necessary paperwork.
Katzman averred that the closing took three hours and that he and Fehrenbach went over each document individually with the Debtors and explained the import of each to the Debtors.
Katzman related that attorney Hoffman was not present as he was on vacation at the time of the closing and after he asked the Debtors if they wanted counsel, the Debtors said they would rather go ahead and close as they could not afford to take any more time off work.
Katzman originally advised that all of the attachments to the July 18,1985 security agreement were in fact physically attached to the original of the security agreement at the time it was executed by the Debtors, and that although the pre-printed form security agreement had generic, boiler plate language describing the collateral, Katzman also had a specific grant of a security interest as to certain specific collateral in the attachments to the security agreement to make it clear that they were in fact included in the security agreement when it was signed. Katzman also advised that although the printed security agreement had an omnibus or dragnet clause which granted a security interest in all of *942 the Debtors’ property, Katzman also wanted as detailed a list of collateral as possible at the time and at the same time wanted the general language describing the collateral as he knew the Debtors had additional cattle beyond those on the list supplied by the Debtors.
Katzman later related on cross-exam that at the time of the execution of the July 18, 1985 security agreement, the equipment list and the cattle lists were not all physically annexed but each document was separated by a paper clip, and that after they were executed within five minutes or so the “list” or attachments were stapled together. As to the fact that the typewritten list of cattle had the handwriting granting the lien and the Debtors’ signature only on the first page, Katzman related that Fehren-bach wrote in the language on the first page but meant to include the second page also, although he did not, and the Debtors did not execute the second page.
The first page of the printed security agreement provided by the Bank for the Debtors’ execution on July 18, 1985 (Defendants Exhibit No. 9) is set out below:
*943 [[Image here]]
*944 This document had attached thereto the equipment list, the two-page typewritten list of cattle, and the four-page “T.P.R.” computer list of cattle dated July 18, 1985, and the two documents relating to the assignment of the lawsuit, copies of which were subsequently attached by the Bank to the November 19,1985 security agreement. The signed copy of the Bank’s 1985 crop form was not attached to the July 18, 1985 security agreement.
As to the “Agreement” dated July 18, 1985 executed by both Debtors and the Bank (attached as the second, unnumbered document to November 19, 1985 security agreement; Defendant’s Exhibit No. 8), Katzman stated that paragraph no. 7 thereof was a compromise reached between the parties and that the Debtors granted the Bank a security interest in all of the Debtors’ cattle and 1985 crops as additional security as Greives felt he could comply with the other provisions of paragraph no. 7 by partial repayment at a later time, and thus eventually obtain a release of this additional collateral from the Bank. Clauses 3, 4' and 7 of the July 18, 1985 “Agreement” provides as follows:
The undersigned agree that the loan transaction which is being closed on July 18, 1985, at the Bank of Western Indiana, Attica Branch, between George J. Greives, Jr., and the Bank of Western Indiana, is based partly on the following:
$ nt # # #
3. That George J. Greives, Jr. has agreed to pay all proceeds from any and all private treaty sales and auction sales of the cattle which are pledged to Bank of Western Indiana directly to the Bank of Western Indiana as soon as the funds become available to George J. Greives, Jr.
4. That George J. Greives, Jr. and the Bank of Western Indiana shall agree to how many lots will be sold at the cattle auction scheduled for September of 1985. Said agreement by both parties shall be reasonable in nature.
# # # # # #
7. That the Bank of Western Indiana agrees to release its security position in the 1985 crops and its security position on the remaining cattle of George J. Greives, Jr. upon the payoff of the new funds advanced on July 18, 1985, including interest and upon payment of $50,000.00 principal reduction on the existing indebtedness that George J. Greives, Jr. presently has with the Bank of Western Indiana, provided that said payments are received by the Bank of Western Indiana before September 30, 1985.
The Bank also called Richard Baberchak an agricultural loan specialist with the Bank.
Baberchak testified that in late June of 1986 he had a conversation with Greives who advised him that he was farming 101 acres of corn, 150 acres of soybeans, and 60 acres of wheat, and that the normal yield for these crops were as follows:
1. Wheat: 60 bushels per acre
2. Corn: 125 bushels per acre
3. Soybeans: 50 bushels per acre
Baberchak stated he investigated current crop prices and that he ascertained the following cash prices for the above crops on the open market:
1. Wheat (not active-elevators reserved for com and soybeansHast quote-$2.00 per bushel
2. Soybeans-$4.80 per bushel
3. Corn-$1.47 per bushel
Baberchak stated that the U.S. Government’s 1986 feed and grain program would bring a better return for the Debtors, that the ASCS loan rate for corn was $1.91 ($1.83 after Grahman-Rudman adjustments), . and that the ASCS loan rate for soybeans was $4.56.
On cross-examination Baberchak was asked if there were additional costs to the Debtors such as commercial storage at an elevator at 36<t a bushel or on the Debtors’ own farm at 26<t a bushel, plus drying and transportation costs. He stated he was not sure what these costs would be. He also stated that there would, of course, be no storage costs on a cash sale but that the *945 Debtors might incur the other costs discussed above.
Baberchak estimated the approximate value of the Debtors’ 1986 crop as follows:
1. Cash price: $61,000 (Before drying and transportation).
2. Government loan price: $70,000 (Before storage, drying, and transportation).
Baberchak stated the “Blue Book” value of the 1976 Buick Electra was $700.00. He had no market report on the 1979 Chevrolet truck. The Defendant was granted leave to file a market report on the 1979 truck which the Defendant filed by letter to the Court dated November 21, 1986 in which National Market Reports, Inc., No. 76, Vol. 4, October 1, 1986 valued the truck at $3,200.00.
The Bank called Mark W. Jones, a professional farm manager, appraiser and broker. He testified as an expert witness as to the value of the Debtors’ real estate in which the Bank holds a real estate mortgage. His opinion was that the 633.255 acres in question had a value of $691,-899.00. His written appraisal of September 4, 1986, together with certain corrections dated September 23, 1986 was admitted without objection. (Defendant’s Exhibit No. 31).
Jones related that of the three primary methods of appraisal, i.e. market data, cost, and earnings, he concentrated on market data and cost rather than earnings as he did not have access to the figures necessary to determine if the Debtors’ operation could generate a net income.
Jones related that as to the cost approach he broke the real estate down into components and found the following: 1) tillable land — good; 2) pasture land — good; 3) roads and ditches, and, 4) buildings valued at replacement cost less depreciation.
As to the improvements on the real estate, Jones stated he based the reproduction cost for the buildings on the Marshall Evaluation Service which factors in costs by geographic area, and establishes depreciation based on the condition of the improvements.
Jones stated that the value of the residence was fixed by him at $149,763.00, although this 2,000 square foot dwelling only had a contributory value of $76,000.00 based on the Marshall Evaluation Service, because it was located close to Purdue University and the surrounding area is highly urban in nature, thus increasing its marketability. Jones noted that the house was well built, had enjoyed average maintenance, and should last 70 to 80 years or possibly longer.
Jones also opined as to useful life of the following improvements:
1. Morton barn — 40 years if had normal maintenance and repair.
2. Sheds-40 years if had normal maintenance and repair.
3. Grain and storage bins — 30 to 40 years if had normal maintenance and repair.
Jones stated that per his examination of an Agricultural Stabilization and Conservation Service (“ASCS”) map he determined that out of the 633.255 total acres, comprised of the two tracts, 345.8 acres were tillable.
Jones estimated it would take a range of three to six months to sell the property, the period being closer to three months if accomplished by a broker and the period being closer to six months if the Bank tried to sell the property on its own. Jones added that if conventional financing were used he thought that the sale could be closed approximately 30 days after the contract of sale was executed. He further estimated that the real estate commissions would probably be five per cent, and that from this to obtain a net sales figure would have to be deducted normal closing costs and prorations for such items as real estate taxes.
Jones averred that the best and highest use for the land was agricultural and that some of the Debtors’ land that is now being used as pasture land could be tilled. There would be a cost to this conversion and some land would have to be merely plowed, i.e. 50 to 75 acres, while some would have to be bulldozed. Jones pointed out however, that *946 if the new land was put into production, the Debtor would not be able to plant corn and still be eligible for any of the federal programs.
Based on ASCS figures, Jones gave an estimate of the present yields, gross income and expenses and net income where corn is the crop to be grown. He projected corn would bring $1.15 a bushel, net after drying, with a yield of 106 bushels per acre for a gross income of $122.00 per acre. (Jones noted that ASCS average figures are usually on the low side). From this would be deducted production costs of which $80.00 an acre would be for direct input ($35.00 for fertilizer; $20.00 for seed; $15.00 for chemicals; and, $10.00 for gas to disc, plow and harvest). To this would be added an estimated $30.00 for the cost of the farm machinery (depreciation, interest, and maintenance). Thus, based on the present market, the cash prices received for com do not make that crop a profitable venture. However, the government loan price is $1.84 plus deficiency payments. He added that higher gross income per acre could be achieved by planting soybeans and that the actual yield on com can vary up to thirty to forty bushels per acre.
George Joseph Greives, Jr. (hereinafter: “Greives”) testified on behalf of the Debtors.
Greives testified that in May or June of 1985, he retained attorney Hoffman to work out his financial problem with the Bank and Katzman, its attorney. He further related that he was familiar with the various communiques between the Bank, attorney Katzman, and attorney Hoffman leading up to the July 18, 1985 agreement.
Greives added that when he was advised by attorney Hoffman that his initial offer to grant the Bank a lien in 50 cattle was rejected, he told attorney Hoffman that he would be willing to grant the Bank a lien in a total of 80 cattle. Greives stated that he had no further discussion with attorney Hoffman regarding the number of cattle to be pledged prior to the July 18, 1985 closing, was never advised prior thereto that his offer to grant a lien in 80 cattle was ever unacceptable to the Bank, nor did the Bank advise the Debtors when they provided the Bank their handwritten list of cattle that any additional cattle would be required by it.
He related that his understanding regarding the total number of cattle to be collateralized, prior to and at the time of the July 18, 1985 closing, was that a total of some eighty-odd cattle would be secured, as he had originally offered fifty which the Bank rejected, and he then offered thirty plus more which the Bank did not advise him it had rejected. Thus, at the time of the closing Greives stated he did not intend to grant a security interest in all his cattle then owned or thereafter acquired.
Greives also related that although the Debtors affixed their signatures to the first page of the two-page typewritten list of cattle attached,to the July 18, 1985 security agreement, he did not personally prepare that list. He advised that he had personally prepared a specific, two page list of cattle in longhand which he had brought to the closing along with a computer printout called a “total performance record” or “T.P.R.” which included, among other things, the cattle set out on the handwritten list of 86 cattle prepared by the Debtors together with all other cattle that the Debtors and their children owned (The T.P.R. at the top shows, “Breeder, George J. Greives, Jr. and family_”). Greives stated he told the Bank it could also find the various specific cattle to be collateral-ized as set out on his handwritten list and on the computer list, and that he brought the computer printout in to assist the Bank in the event they had trouble reading or working off of his handwritten list. The Bank thus prepared the two-page typewritten list of cattle subsequently attached to the July 18, 1985 security agreement. (Tr. 11/3/86, P. 81, LL.22-25; Tr. 11/3/86, P. 32, LL. 1-25; P.33, LL. 1-11) Greives stated the “T.P.R.” list included cattle the Debtors owned at the time, cattle the Debtors never owned, cattle that had been previously owned by the Debtors, some cattle that were never on the Debtors’ farm, cattle owned by other members of the Greives family, and that there were some cattle *947 that the Debtors owned that were not on the T.P.R. list.
Greives stated the Debtors did affix their signatures to the bottom of the first page of the four-page T.P.R. computer list, but that the handwritten words immediately preceding their signatures purportedly granting the Bank a lien in “the above-listed cattle” were not there, to his knowledge, when it was executed (Tr. 11/3/86, P.38, LL. 4-6). The Debtors introduced into evidence the original T.P.R. computer printout they brought with them to the closing. It does not have thereon the handwritten language above their signatures purportedly pledging all of the cattle on the T.P.R. list to the Bank. Greives admitted the Debtors’ signatures were at the bottom of the T.P.R. list but stated that the handwritten language above it granting a security interest was not thereon. The Plaintiff had admitted into evidence the original T.P.R. printout which has no writing on it whatsoever as opposed to the writing and the signatures of the Debtors on the copy of the T.P.R. attached to the security agreement. (Plaintiffs Exhibit No. 2) (Tr. 11/3/86, P.55, LL.22-24; P.56, LL.1-16). He also asserted he did not see the unsigned second page of the typewritten list of cattle at the closing. (Tr. 11/3/86, P.34, LL.2-5; Tr. 11/3/86, P.55, LL.5-7).
It should be noted that the two-page, handwritten list of specific cattle provided by the Debtors prior to closing as set out in Defendant’s exhibit no. 34, which was mailed by the Debtors to attorney Katz-man, contains exactly the same information as the first page of the typewritten list prepared by the Bank. However, the handwritten list contains none of the cattle set out on the second page of the typewritten list of cattle prepared by the Bank which was not signed by the Debtors. It is also noted that the second page of the typewritten list of collateral apparently prepared by the Bank along with the first page, was typed with a different typewriter than the first page. If the second typewritten page listing additional cattle was prepared by the Bank prior to execution it would seem likely it would have been prepared on the same typewriter at the same time. There seems to be some confusion as to whether the handwritten list of cattle provided by the Debtors to the Bank’s counsel, attorney Katzman, by mail, postmarked May 11, 1985 (Defendant’s exhibit no. 34) (Tr. 11/3/86, P.108, LL. 14-25: P. 109, LL.1-19) formed the basis of the typewritten list prepared by the Bank, or whether the Debtors brought in a like list or a copy of the handwritten list to the July 18, 1985 closing. (Tr. 11/3/86, P.32, LL.6-11). Nevertheless, it is clear that the first page of the typed list of cattle was taken verbatim from handwritten list provided by the Debtors while the cattle set out on the second page of the typewritten list was not included on the Debtors’ handwritten list.
Greives stated that the attachments to the July 18, 1985 security agreement were not stapled together at the time of the closing and after the July 18, 1985 closing he did not receive a copy of the July 18, 1985 security agreement with all documents attached, but received only the printed security agreement, or cover page only. He also asserted that he later found his copy of the printed security agreement in his file at home with no attachments or staple marks thereon (Plaintiff’s Exhibit No. 1).
Thus, Greives acknowledged that while the Debtors granted the Bank a security interest in their cattle, it was only in those specific cattle set out in the first page of the typewritten list signed by them, but not all those cattle set out on the four-page T.P.R. printout, or any and all cattle as set out in the general language of the printed security agreement.
Also admitted into evidence (Plaintiff’s Exhibit No. 3), by agreement of the parties, is an affidavit by attorney Hoffman, the Debtors’ attorney, prior to the execution of the July 18, 1985 security agreement. He averred that originally the Debtors offered fifty cattle as security and then eighty cattle, that he left on vacation and advised attorney Katzman he would have to discuss the cattle with the Debtors, and that he had no further discussion with the Debtors or attorney Katzman until after the closing.
*948 As to the November 19, 1985 meeting at the Debtors’ residence with Fehrenbach, Greives related that when he signed the security agreement he did not read the same but had the understanding that he was merely executing a renewal note of the July 18, 1985 note and not an additional security agreement granting the Bank additional security. (Tr. 11/3/86, P.43, LL.l-2). Greives also stated there was no discussion of the 1986 crop before the documents were signed. Greives stated that Fehrenbach showed him the November 19, 1985 committment letter directed to him by the Bank for the first time at the meeting at the Debtors’ farm after the documents which he thought were a renewal note were signed, (Defendant’s Exhibit No. 2) and that he refused to sign the same. (Tr. 11/3/86, P.43, LL. 16-25; P.44, LL.1-25; P.45, L.1). When Fehrenbach left after the documents were signed, Greives stated that Fehrenbach told him he would talk to the loan committee and see if he could come up with a different arrangement, but never heard from him again. Greives also stated that he later called Fehrenbach and discussed the possibility of giving the Debtors’ fertilizer supplier a lien in the Debtors’ 1986 crop as the 1985 fertilizer had not been paid for, and no mention was made by Fehrenbach that the Bank already had a lien on the 1986 crops.
Greives asserted that although he and Fehrenbach had a general discussion regarding the 1986 crops, Fehrenbach never specifically addressed the issue of placing a lien on the 1986 crops at their November 19, 1985 meeting, and the first time he was aware that the Bank was asserting a lien thereon was when he had a discussion of the relevant documents with his attorney on July 3, 1986.
Greives stated that when he signed the “Agreement” dated July 18,1985, (which is also second unnumbered attachment to the November 19, 1985 security agreement, supra), that the cattle listed in the attachment to the July 18, 1985 security agreement was what was being referred to in the July 18, 1985 “Agreement”.
Greives admitted that the Debtors did sign a UCC-1 financing statement which was filed with the Warren County recorder on July 22,1985 (Defendant’s Group Exhibit No. 29), which states that the financing statement covered all of the Debtors’ livestock then owned or thereafter acquired, including but not limited to those set out on a list attached thereto, but denies he intended to pledge all his cattle by executing that document, as he did not know what the document meant as he did not have his counsel present at the July 18, 1985 closing. He added that the statement in the UCC-1 that the estimated value of the cattle as being $309,000.00 was “ridiculous”. (The typed list attached to the UCC-1 appears to be identical to both pages of the typewritten list of cattle attached to the July 18,1985 and November 19,1985 security agreements).
Ill
Conclusions of Law and Discussion
The initial issues which the Court must resolve are the following:
1. Did the Debtors by virtue of the November 19, 1985, Security Agreement grant the Bank a security interest in the Debtors’ 1986 crops and the proceeds thereof?
2. Did either the July 18, 1985 Security Agreement, or the November 19, 1985 Security Agreement grant to the Bank a security interest in any and all cattle owned and thereafter acquired (including offspring) by the Debtors, or only those specific cattle in existence on July 18, 1985 as set out in the first page of the typewritten list signed by the Debtors on July 18, 1985, and attached to both the July 18, 1985 and November 19, 1985 Security Agreements?
Whether an agreement creates a lien depends on state law. Matter of Martin Grinding and Mach. Works, Inc., 793 F.2d 592, 594 (7th Cir.1986), citing, Butner v. United States, 440 U.S. 48, 54-57, 99 S.Ct. 914, 917-919, 59 L.Ed.2d 136 (1979).
The perfection of the Bank’s security interest is not at issue as the requisite *949 perfection pursuant to the Indiana UCC is conceded by the Debtors (See p. 1 of Debtors’ brief filed November 17,1986). Nevertheless, even though proper UCC financing statements have been filed, this only goes to the perfection of the Bank’s security interest vis-a-vis third parties. Thus, there still must be a valid underlying security agreement between the Bank and the Debtors before the Bank can claim a security interest in the Debtors’ property. In re Rex Printing, Inc., 14 B.R. 403 (Bankr.N.D.Ind.1981). The fact that the Debtors signed the UCC-1 financing statement does not, standing alone, satisfy the requirement that the Debtors must have executed an underlying security agreement expressly granting the Bank a security interest. There are no Indiana cases on this point. However, see, 6A UCC Case Digest ¶ 9203.8 (Callaghan & Co.) for numerous cases in support of this propostion.
The issue is whether pursuant to I.C. 26-1-9-203 the Security Agreements created enforceable security interest in all of the Debtors’ cattle and 1986 crops. The relevant portions of this section states:
Sec. 203. (1) Subject to the provisions of section 4-208 on the security interest of a collecting bank and section 9-113 on a security interest arising under the Article on Sales, a security interest is not enforceable against the debtor or third parties unless
(a) the collateral is in the possession of the secured party; or
(b) the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops or oil, gas or minerals to be extracted or timber to be cut, a description of the land concerned. In describing collateral, the word “proceeds” is sufficient without further description to cover proceeds of any character.
The relevant Uniform Commercial Code Comments to this section state as follows:
5. The formal requisites stated in this Section are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies subsection (l)(b), is not enforceable even against the debt- or, and cannot be made so on any theory of equitable mortgage or the like. If he has advanced money, he is of course a creditor and, like any creditor, is entitled after judgment to appropriate process to enforce his claim against his debtor’s assets; he will not, however, have against his debtor the rights given a secured party by Part 5 of this Article on Default. The theory of equitable mortgage, insofar as it has operated to allow creditors to enforce informal security agreements against debtors, may well have developed as a necessary escape from the elaborate requirements of execution, acknowledgment and the like which the nineteenth century chattel mortgage acts vainly relied on as a deterrent to fraud. Since this Article reduces formal requisites to a minimum, the doctrine is no longer necessary or useful. More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing.
West’s Annotated Indiana Code 26-1-9-203, p. 417 (1986).
Indiana Code 26-1-9-110 requires that the security agreement reasonably identify what is described in the security agreement. The Uniform Commercial Code comments thereto states that, “the requirement of description of collateral (see section 9-203 in Comment thereto) is eviden-tiary”. West’s Indiana Code 26-1-9-110, p. 403 (1980). See also, Cargill Incorporated, v. Perlich, 418 N.E.2d 274, 280 (Ind.App. 3rd Dist.1981).
State law controls as to the construction of an ordinary contract. Transcontinental & Western Air, Inc. v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325 (1953). The same is true as to such a contract’s validity. In re Pointer Brewing Co., 105 F.2d 478 (8th Cir.1939); Delta *950 Corp. of America v. Sebrite Corp., 391 F.Supp. 638 (E.D.Tenn.1974).
The state statute of frauds is also applicable in such a context. Watson v. McCabe, 527 F.2d 286 (6th Cir.1975). Indiana Code 26-1-9-203 is the applicable statute of frauds as it relates to security interests in personal property and fixtures. State law is also applicable as to the parol evidence rule. Zell v. American Seating Co., 138 F.2d 641 (2d Cir.1943), rev’d, on other grounds per curiam, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552, (1944); Rock-Ola Mfg. Co. v. Wertz, 282 F.2d 208 (4th Cir.1960); Vanston v. Connecticut General Life Ins. Co., 482 F.2d 337 (5th Cir.1973).
As pointed out by the Bankruptcy Court in the case of In re W.T. Grant, 1 B.R. 516 (D.C.N.Y.1979), whether parol evidence may be admitted to vary the terms of a written agreement is a matter of substantive law rather than evidentiary law. Thus, a United States Court must apply state law to resolve such an issue.
In Indiana, the parol evidence rule is not a rule of evidence but of substantive law. Denham v. Degymas, 237 Ind. 666, 147 N.E.2d 214 (1958); Seastrom Inc. v. Amick Constr. Co., Inc., 161 Ind.App. 309, 315 N.E.2d 431 (1st Dist.Ind.App.1974).
This being the case, the Court will refer to Indiana law regarding contract construction and interpretation and look to Indiana law as whether it can use parol evidence to modify, alter or explain the security agreements in issue.
The Indiana Courts have held that where no ambiguity is found in a contract, its construction is a matter of law for the Court. Piskorowski v. Shell Oil Company, 403 N.E.2d 838 (Ind.App.1980); Wilson v. Kauffman, 156 Ind.App. 307, 296 N.E.2d 432, 437 (1973).
The Court in Piskorowski, supra, at page 844, went on to say that a contract is ambiguous if reasonable men could find its terms susceptible to more than one interpretation, citing Tastee-Freez Leasing Corp. v. Milwid, 173 Ind.App. 675, 365 N.E.2d 1388, 1390 (1977) and Meyers v. Maris, 164 Ind.App. 34, 326 N.E.2d 577, 581 (1975). The test as to ambiguity has also been said to be whether reasonably intelligent persons could reach different conclusions as to the meaning of an instrument. Shahan v. Brinegar, 181 Ind.App. 39, 390 N.E.2d 1036 (1st Dist.Ind.App.1979).
The Piskorowski court further held at page 844 that if the intention of the parties can be gleaned from their written expression of it however, that intention must be effectuated by the court for that is the primary overriding purpose of contract law to ascertain and give affect to the intentions of parties, citing Walb Construction Company v. Chipman, 202 Ind. 434, 175 N.E. 132, 134 (1931) and Fort Wayne Bank Bldg. Inc. v. Bank Building and Equipment Corp., 160 Ind.App. 26, 309 N.E.2d 464, 467 (3rd Dist.1974).
Parol or extrinsic evidence is inadmissible to expand, vary, or explain an instrument unless there is a showing of fraud, mistake, ambiguity, illegality, duress, or undue influence. Orme v. Estate of Kruwell, 453 N.E.2d 355 (4th Dist.Ind.App.1983); Stech v. Panel Mart Inc., 434 N.E. 2d 97 (3rd Dist.Ind.App.1982), Hauck v. Second National Bank of Richmond, 153 Ind.App. 245, 286 N.E.2d 852 (2nd Dist.1972).
If a written instrument appears to be complete on its face and executed, there is a conclusive presumption that it is the ultimate intent of the maker, and its terms and conditions may not be varied or changed by parol or extrinsic evidence and only fraud, mistake, and like matters going to the validity of execution may be considered if put in issue. Lewis v. Burke, 248 Ind. 297, 226 N.E.2d 332 (1967).
The parol evidence rule operates to exclude prior and contemporaneous declarations and transactions offered to vary or contradict the terms of an integrated agreement. American United Life Insr. Co. v. Peffley, 158 Ind.App. 29, 301 N.E.2d 651 rehearing den. 158 Ind.App. 29, 306 N.E.2d 131 (2nd Dist.1973). Accordingly, once a contract has been reduced to writing and executed, all prior and contemporaneous negotiations are merged therein and *951 the rights of the parties must be determined by its terms which cannot be contradicted, qualified or destroyed by evidence of oral negotiations which induced its execution unless it fails to conform to the actual agreement between the parties by reason of fraud, mutual mistake or mistake of one and fraud of the other. McKay Corp. v. Home Ins. Co., 146 F.Supp. 124 (D.C.Ind.1956); Moll v. South Solar Systems, Inc., 419 N.E.2d 154 (1st Dist.Ind.App.1981).
Where, however, a contract term is ambiguous, parol evidence is admissible for the purpose of interpreting the instrument but not to expand its terms. Canada Dry Corp. v. Nehi Beverage, Co., Inc. of Indianapolis, 723 F.2d 512 (7th Cir.1983).
The parol evidence rule also does not apply when the writing shows on its face that it does not embrace the entire contract and additional facts are necessary to show its nature and extent. Citizens’ Progress Co., Inc. v. James O. Held & Co., Inc., 438 N.E.2d 1016 (1st Dist.Ind.App.1982). Thus, where the contract fails to set out the details agreed upon and is not a complete and integrated statement, parol evidence may be considered with respect to such matters. Malo v. Gilman, 177 Ind.App. 365, 379 N.E.2d 554 (3rd Dist.Ind.App.1978).
In addition, the parol evidence rule is not violated by allowing testimony of a distinct collateral independent and contemporaneous oral agreement which is not in conflict with the written agreement. Grande v. General Motors Corp., 444 F.2d 1022 (7th Cir.1971). Traylor v. Lafayette National Bank, 158 Ind.App. 552, 303 N.E.2d 672 (1st Dist.1973). Nor is the rule violated with regard to oral agreements entered into subsequent to the execution of a written agreement. Erie Corp. v. Washington Square Restaurant, Inc., 162 Ind.App. 149, 318 N.E.2d 367 (1st Dist.1974); Blenke Bros. Co. v. Ford Motor Co., 217 F.Supp. 459 (D.C.Ind.1963).
As noted above, the rules relating to the construction of any ordinary contract to be applied by a federal court to a state-created contract are those of the state where the contract was created. Transcontinental & Western Air, Inc. v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325, supra. Pursuant to Indiana Code 26-1-1-103, the law of contracts supplements the provision of the Indiana Uniform Commercial Code which is applicable to these security agreements, while Indiana Code 26-1-1-201(3) defines an “agreement” as a bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing, course of performance or usage of trade. The legal consequences of these security agreements are determined by the provisions of the UCC, if applicable; otherwise by the law of contracts pursuant to Indiana Code 26-1-1-103. Continental Grain v. Followell, 475 N.E.2d 318 (1st Dist.Ind.App.1985). “Contract” pursuant to Indiana Code 26-1-1-201(11) is defined as the total legal obligation which results from the parties agreement as affected by the Code and any other applicable Rules of law.
In Indiana under the “four corners” rule in construing written instruments, determination of the intent of the parties is limited to the express language found within the instrument and where there is no ambiguity, extrinsic evidence cannot be presented as to the intentions of the parties. Skrypek v. St. Joseph Valley Bank, 469 N.E.2d. 774 (3rd Dist.Ind.App.1984). Unambiguous language is conclusive upon the parties and the Court. Turnpaugh v. Wolf, 482 N.E.2d 506 (4th Dist.Ind.App.1985). Thus, where no ambiguity exists and the terms of the contract are plain and clear on the face of the document, the terms are conclusive as to the contract’s meaning. Young v. VanZandt, 449 N.E.2d 300 (1st Dist.Ind.App.1983). Markskill Specialities Inc. v. Barger, 428 N.E.2d 65 (3rd Dist.Ind.App.1981).
The Court must give effect to the meaning and intention of the parties as expressed in the language of the contract, and where the terms of the contract are plain and free from uncertainty, it is not the proper function of the Court under Indiana Law to use any rules of interpretation or construction in determining the pro *952 visions of the agreement. Williams v. National Can Corp., 603 F.Supp. 1268 (D.C.Ind.1985).
As noted by the Court in McLain’s Estate v. McLain, 133 Ind.App. 645, 183 N.E. 2d 842, 848 (1962):
It is not the purpose of the law to abrogate the terms and provisions of contracts by construction where the language is clear and unambiguous but rather to enforce it as entered into by the parties. This rule is more precisely (stated) in Gaw v. LaPorte Corp., (1956), 126 Ind.App. 143, 130 N.E.2d 790 [1956] as follows:
A court is not at liberty to revise a contract while professing to construe it. Neither does it have the right to make a contract for the parties, that is, a contract different from that actually entered into by them....
Where a contract is not ambiguous, the Court must only consider the language contained in the contract to determine the parties intentions and may not consider a secret design in one party’s mind or the conduct of the parties. Williams v. National Can Corp., 603 F.Supp. 1268, supra; Crabtree v. Lee, 469 N.E.2d 476 (1st Dist.Ind.App.1984). Therefore, in construing the contract, a court’s paramount consideration is the objective, not the subjective, intent of the parties. Lincoln Mutual Life Ins. Co. v. NCR Corp., 603 F.Supp. 1393 (D.C.N.D.Ind.1984), aff'd, 772 F.2d 315 (7th Cir.1985). Thus, if a contract is clear and unambiguous on its face, its effect will not be controlled by an erroneous construction placed on the agreement by the parties. Fort Wayne Bldg., Inc. v. Bank Bldg. & Equip. Corp. of America, 160 Ind.App. 26, 309 N.E.2d 464 (3rd Dist.Ind.App.1974).
However, if a contract is ambiguous or uncertain in its terms, then extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties. Reith-Riley Const. Co. Inc. v. Auto-Owners Mut. Ins. Co., 408 N.E.2d 640 (3rd Dist.Ind.App.1980).
Numerous Indiana cases have held that parol evidence is admissible to identify property covered by a chattel mortgage indefinitely describing it. See, e.g., Rudisell v. Jennings, 77 N.E.2d 959, 38 Ind.App. 403, rehrg. denied 78 N.E.2d 263, 38 Ind.App. 403.
In determining the meaning of contractual terms, the Court should read all of the contract’s provisions together to harmonize words and phrases used and to give effect to the parties’ intentions as established at the time they entered into the agreement. Washington Nat. Corp. v. Sears, Roebuck & Co., 474 N.E.2d 116 (1st Dist.Ind.App.1985).
It is a cardinal rule of construction of legal instruments that an instrument will be construed strictly against its author. Chrysler Corp. v. Hanover Ins. Co., 350 F.2d 652 (7th Cir.1965), cert. den. 383 U.S. 906, 86 S.Ct. 890, 15 L.Ed.2d 664. It has been held that this rule of construction comes into play only when all other rules of construction fail. Indiana-Kentucky Elec. Corp. v. Green, 476 N.E.2d 141 (1st.Dist.Ind.App.1985).
If a contract is prepared or drafted by an attorney it will be construed strictly against the party who prepared or drafted it. Mandle v. Owens, 164 Ind.App. 607, 330 N.E.2d 362 (1st.Dist.Ind.App.1975) trans. den. 265 Ind. 252, 353 N.E.2d 465 (1976); Lacey v. White, 153 Ind.App. 504, 288 N.E.2d 178 (1st.Dist.1972).
In addition, under Indiana Law, courts construe a printed form most strongly against the person who prepares it. Thorne v. Aetna Life Ins. Co., 286 F.Supp. 620, (D.C.Ind.1968), aff'd 407 F.2d 809 (7th Cir.1969), cert. den. 90 S.Ct. 71, 396 U.S. 826, 24 L.Ed.2d 77: Colonial Discount Corp. v. Berkhardt, 435 N.E.2d 65 (1st.Dist.Ind.App.1982).
Ambiguities in “contracts of adhesion” which are standardized contracts imposed and drafted by parties of superior bargaining strength, who relegates to the subscribing party only the opportunity to adhere to the contract or reject it are resolved against the drafter. Freeman v. Commonwealth Life Ins. Co. of Louisville Ky., 149 Ind.App. 211, 271 N.E.2d 177 (1971), *953 Petition denied, 259 Ind. 237, 286 N.E.2d 396 (1972).
When construing a contract on a printed form and there is an apparent conflict, writing prevails over printing, handwriting over typewriting, and typewriting over printing. State v. Scott Const. Co., 97 Ind.App. 652, 174 N.E.2d 429 (Ind.App.1931); Scott v. Anderson Newspapers, Inc., 477 N.E.2d 553 (4th. Dist.Ind.App.1985).
When writings are executed at the same time and relate to the same subject matter, they must be construed together in determining the contract, and consideration for one instrument may be found in a contemporaneous instrument. Goeke v. Merchants Nat. Bank and Trust Co. of Indianapolis, 467 N.E.2d 760 (1st. Dist.Ind.App.1984). This Rule however, should not be arbitrarily applied without regard to the realities of each peculiar factual situation. Keystone Square Shopping Center Company v. Marsh Supermarkets, Inc., 459 N.E.2d 420 (3rd Dist.Ind.App.1984).
In determining the intention of the parties to a contract, the Court may consider the circumstances which existed when the contract was made; it may also consider the nature of the contract, its subject matter and the apparent purpose of making the contract. American Fletcher Mortgage Co. v. Cousins Mortg. and Equity Investments, 623 F.2d 1228 (7th Cir.1980).
It should also be noted that it is an accepted rule of construction, that a special clause in a contract fitting special circumstances must prevail over a general clause applicable generally to other situations. Fox Realty Co. v. Montgomery Ward & Co., 124 F.2d 710 (7th Cir.1941). And, it also is held that words of a particular meaning will control more general terms when they cannot stand together. Fineberg v. Clark, 137 Ind.App. 528, 209 N.E.2d 528, (1965), rehrg. den. 137 Ind.App. 545, 210 N.E.2d 260 (1965).
As pointed out in Rempa v. LaPorte Production Credit Ass’n, 444 N.E.2d 308, 311 (Ind.App. 3rd Dist.1983), IC 26-1-9-105(1)(h) defines a “security agreement” as, “an agreement which creates or provides for a security interest.” The Court noted that an “agreement” is also defined in the Code as “the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing and usage of trade as provided for in the Act (Sections 1-205 and 2-208) (emphasis added) 1C 26-1-1-201(3).”, and that a security agreement is “simply a visage of the underlying contract between the debtor and the creditor.” The Rempa court quoted White and Summers, Uniform Commercial Code (2nd Ed.), pp. 904-906 with approval which states:
Section 9-203 requires a ‘security agreement,’ a term defined in 9-105 as ‘an agreement which creates or provides for a security interest.’ The conjunction of 9-203 and 9-105 calls for two independent inquiries. The court must first resolve, as a question of law, whether the language embodied in the writing objectively indicates that the parties may have intended to create or provide for a security interest. If the language crosses this objective threshold, that is, if the writing evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the factfinder must inquire whether the parties actually intended to create a security interest. Par-ol evidence is admissible to inform the latter, but not the former, inquiry. (Emphasis in original).
Id. at 311-312.
The Rempa Court added:
Moreover, security agreements represent consensual liens created by agreement of the parties. The fundamental requirement of a meeting of the minds is inherent in such agreements, as it is in all contracts. “Without a contract there can be no security interest.” In re Metzler (N.D.Ala.1975), 405 F.Supp. 622, 625.
Therefore the terms of the underlying contract are not foreclosed to inquiry by the mere appearance of a security agreement. Extrinsic evidence is admissible under the U.C.C. to aid the trier of fact in its task of ascertaining the intent of the parties.
*954 Id. at 312. (Emphasis added).
In Rempa, the debtors signed blank a security agreement and financing statement along with a fully completed note. The creditor then completed the security agreement after it was executed. A dispute arose between the debtor and creditor as to what was to be inserted into the security agreement as collateral for the debt. The question was whether any enforceable security interest had been created in the debtor’s farm equipment and crops. The Rempa court stated:
[a] debtor’s signature in blank does not obviate this requisite consensual element of a secured transaction. The validity of a security agreement signed in blank by the debtor and subsequently completed by the creditor was considered in In re Allen, (E.D.Ill.1975), 395 F.Supp. 150. In that case the debtors signed the security agreement before a description of the collateral had been written in. The debtors argued that on this basis alone the security interest was invalid. The court found otherwise.
“The fact that the primary reason for requiring a written memorandum is evidentiary and the fact that in the instant case a description of the collateral was subsequently written in the agreement so that it accurately reflected the intent of both parties, leads this Court to conclude that upon completion of the requirements in Section 9-203 a valid and enforceable security interest was created.”
395 F.Supp. at 151. Regardless of the order of completion and signing, the security agreement was valid since it “accurately reflected the intent of both parties...” (Emphasis added in the original).
Id. at 312.
The Court noted however that:
[a] debtor’s act of signing a blank security agreement does not authorize the secured party to complete the document according to his predilections. The secured party is bound, by rules of contract and basic notions of fair dealing, to observe the underlying agreement between the parties. If the secured party fails, either inadvertently or intentionally, to complete the security agreement accordingly, then at least between the parties the debtor should not be liable for consequential losses precipitated by the secured party’s deviation from the underlying agreement. Whether the security agreement conforms to the terms of the underlying agreement is a question of fact.
Id. at 313.
While the. case at bar obviously does not involve a situation where the printed security agreements were signed in blank, because of the conflicting terms of the attachments thereto which were attached after the printed security agreements were executed, there is a genuine factual issue as to the contractual intent of the Debtors prior to the physical execution of the security agreements; that is, whether at the very inception there was in fact a meeting of the minds between the parties as to the scope of the underlying agreements to form a security interest as alleged by the Bank.
As noted by the Court in Kruse, Kruse & Miklosko v. Beedy, 170 Ind.App. 373, 353 N.E.2d 514 (3rd Dist.1976), I.C. 26-1-9-203(1) and I.C. 26-1-9-204 incorporate four general requirements for the creation of an enforceable security interest. IC 26-1-9-204(1) provides that, “a security interest cannot attach until there is an agreement (subsection (3) of section [26-1] 1-201) that it attach, value is given and the debtor has rights in the collateral. These four requirements are as follows:
1) There must be an agreement creating or providing for a security interest.
2) The debtor must have signed a security agreement containing a description of the collateral; or the secured party must acquire possession of the collateral.
3) The debtor must acquire rights in the collateral.
4) And, the secured party must give value.
Id. at 555.
The Kruse Court added:
*955 As for the first such requirement, IC 1971, 26-1-1-201(3) (Burns Code Ed.), provides that:
“ ‘Agreement’ means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act (sections [26-l-]l-205 and [26 — 1—]2— 208). Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts (section [26-l-]l-103). (Compare ‘Contract.’)”
The Court having heard the evidence, and having examined the July 18, 1985 and November 19, 1985 security agreements, and the negotiations leading up to the execution thereof, finds that said security agreements are as a matter of law ambiguous and reasonably susceptible to two different interpretations, and thus the court may consider parol evidence, the circumstances surrounding the executing of these two security agreements, and the rules of construction as to contracts as enunciated by the Indiana courts to interpret the same and to determine if these security agreements accurately reflect the underlying agreements of the parties, i.e. the intent of the Debtors to secure their obligations with the Bank with all of their cattle and the 1986 crops. By parol evidence is meant extrinsic evidence, whether oral or written. See, Matter of Martin Grinding & Mach. Works, 793 F.2d 592, 595, supra.
The Court will first address the issue of whether the July 18, 1985 security agreement and/or the November 19, 1985 security agreement, constituted the grant of a security interest in all of the Debtors’ cattle owned by the Debtors at that time as well as those thereafter acquired as set out in the printed boilerplate language on the first printed page of each of said security agreements which have the “omnibus” or “dragnet” language, or whether the intention was to only grant the Bank a security interest in the first page of the typewritten list of specific cattle attached to those security agreements.
All of the negotiations and the course of dealings leading up to the execution of the July 18, 1985 security agreement indicate that the Debtors, in fact, only intended to grant the Bank a security interest in the specific cattle set out in the first page of the typewritten list attached thereto. Further, the evidence indicates that the negotiations between the Bank’s attorney, Katz-man, and the Debtors’ attorney Hoffman culminated in the Debtors finally conceding to raise the number of cattle he would pledge from fifty to a specific total of eighty-six. The various phone calls and correspondence of counsel and dealings that transpired between the Bank and its counsel and the Debtors’ and their counsel leading up to the July 18, 1985 closing indicate that the contractual intent of the Debtors was to place a lien only on the eighty-six cattle set out on the first page of the typewritten list. At the July 18, 1985 closing the Debtors, without their counsel present, signed numerous documents which were not only complex in nature but confusing and ambiguous as to their import and significance in that they were not physically attached or clearly referenced to each other. The Court finds they indicate a contractual intent of the Debtors to only place a lien on the eighty six cattle on the first page of the typewritten list. The second typewritten page listing certain cattle was typed on a separate typewriter and not attached to the July 18, 1985 security agreement when signed by the Debtors. While the plain boiler-plate language on the first page of the printed form prepared by the Bank, which was reviewed by the Bank’s counsel and not the Debtor’s counsel, states that the Debtors are granting a blanket security interest in “All farm products of Debtors, whether now owned or hereinafter acquired, including but not limited to (1) all poultry and livestock and their young, products thereof and produce thereof, ...”, the first page of the attached typed list has the handwritten language “the above listed cattle are being pledged to the Bank of Western Indiana to secure the undersigned indebtedness” (emphasis added). No reference is made in the first page of the typewritten list that all cattle *956 were to be mortgaged notwithstanding this very specific language. Nor does the printed language on the first page of the security agreement state that the specific language in the attached typewritten list was not limiting, i.e. that the attached list was “including but not limited to the above cattle”, a very simple drafting task. In addition, the list on the “T.P.R.” computer printout provided by the Debtors to the Bank is inconsistent with the typed list prepared by the Bank, and even included cattle which the debtors did not even own at the time or were owned by third parties. The T.P.R. four-page computer printout has the following handwritten language at the bottom of the first page thereof: “The above listed cattle is (sic) being pledged to the Bank of Western Indiana to secure the undersigned indebtedness.” This is certainly ambiguous, and inconsistent with the language on the face of the printed security agreement and the typewritten list.
Thus, the Debtors purportedly granted a lien to the Bank in all or some of their cattle on three separate documents at the July 18, 1985 closing, none of which are consistent with the other and none of which were physically annexed to the other at the time of actual execution. The first page of the printed security agreement, the first page of typewritten list prepared by the Bank, and the “T.P.R.” computer printout provided by the Debtors to the Bank all had language prepared by the Bank purporting to grant it a security interest in some or all of the Debtor’s cattle, and as to the T.P.R. list, it purportedly granted the Bank a security interest in cattle the Debtors did not even own.
The July 18, 1985 security agreement with the two attachments relating to the cattle, i.e. the typewritten list and the “T.P. R.” computer printout, all of which were executed by the Debtors, when read together, are inherently conflicting and inconsistent as to what cattle was intended by the parties to secure the Debtors’ obligation to the Bank, and thus is certainly susceptible to more than interpretation by reasonably intelligent persons. The haphazard and piecemeal manner in which these security agreements were prepared, and physically assembled by the Bank makes it impossible for the Court to determine the true intention of the parties by merely examining the language as set out within their four corners. As a consequence, the Court finds that as a matter of law the security agreements are reasonably susceptible to more than one conclusion as to their meaning and are thus ambiguous.
The Court having found that portion of the security agreement to be ambiguous, it may apply the rules of contract construction, consider parol evidence, including pri- or and contemporaneous transaction and the extrinsic circumstances to determine the true scope and extent of the security agreements in question.
The Court finds that the first page only of the typewritten list prepared by the Bank from the handwritten list submitted by the Debtors to the Bank is the controlling document as to what cattle are security for the indebtedness due to the Bank by the Debtors. All prior transactions indicate that this was the true intention of the Debtors who as the granting parties are the only necessary signatories to the security agreement (the Bank is not legally required to execute the security agreement for it to be binding on the Debtor). In addition, where there is a conflict between the printed and typewritten provisions of an agreement, the Rule of construction as noted in State v. Scott Construction Co., and Scott v. Anderson Newspapers, Inc., supra, is that the typewritten provision shall prevail over the printed provision. This Rule of Construction is clearly applicable here in that the typewritten list, which the Bank itself asserts is part and parcel of the security agreements, and which it prepared and caused to be attached to the security agreements, conflicts with the provision of the printed security agreement as to the Debtors’ cattle. Further, the handwritten language inserted by the Bank at the bottom of the first page of the typewritten list of cattle, whereby it is stated that, “the above listed cattle are being pledged ...” also conflicts with the provi *957 sions of the printed security agreement as to the cattle and the T.P.R. computer list.
In addition, the printed form by which the Debtors purportedly granted a blanket security interest in all cattle was prepared by the Bank, and thus inasmuch as the printed security and the “lists” that were attached post-execution are ambiguous the Court will construe this form when interpreted in light of the two conflicting attachments thereto relating to the cattle strictly against the Bank. See, Thorne v. Aetna Life Insur. Co., 286 F.Supp. 620, and Colonial Discount Corp. v. Berkhardt, 435 N.E.2d 65, supra.
The Bank had counsel advise it and oversee the drafting, preparation and assembly of the July 18, 1985 documentation, while the Debtor was without the assistance of counsel at that particular time and thus said agreement must also be strictly construed against the Bank on that basis. See, Chrysler Corp. v. Hancock Ins. Co., supra.
The Court also finds that based on the rule of construction that specific language must control over general language when the two cannot stand together, the specific handwritten language on the first page of the typewritten list of collateral which states that “the above listed cattle are being pledged to the Bank ... to secure the undersigned indebtedness” controls over the general clause in the printed secured agreement which purportedly gave the Bank a blanket lien in all the Debtors’ cattle. See, Frieberg v. Clark, 209 N.E.2d 538, supra. The T.P.R. computer list also annexed to the security agreement by the Bank just compounds the confusion as many of the cattle set out therein were non-existent, or belongs to entities other than the Debtors. The Court does not deem the specific typewritten list to be mere surplusage over and above the printed language, but the controlling language as to the cattle subject to the Bank’s security interest. There is no way that the Court can harmonize these three distinct documents relating to the collateralization of the cattle, and being unable to do so, the instrument will be construed strictly versus the Bank as set out above.
In to to, looking at the prior negotiations of the parties, the circumstances surrounding the transactions, the nature of the agreement, and the inherent ambiguities and inconsistencies in both the July 18, 1985 and November 19, 1985 security agreements relating to the cattle, the Court finds that a strict construction of those instruments against the Bank leads to only one conclusion: that the Debtors only granted to the Bank a security interest only in the specific cattle set out in the first page of the typewritten list prepared by the Bank and no other cattle.
As to the 1986 crops, the Court finds from all the extrinsic evidence as to the circumstances surrounding the transaction that the Debtors did not intend to collateralize the same by virtue of the November 19, 1985 security agreement.
The information regarding the 1986 crop was obtained from George Greives during the course of his discussions with Fehren-bach on November 13, 1985. The testimony of both Fehrenbach and Greives indicate that there was no prior oral agreement at that time that the Debtors would grant the Bank a security interest in their 1986 crops. The Bank’s form as to the 1986 crop program attached by the Bank to the November 19, 1985 security agreement was not signed by the Debtors as was the 1985 crop program form attached to the July 18,1985 security agreements. In addition, Fehren-bach admitted he attached the 1986 crop form at the Bank after the agreement was executed. If the Bank felt it had a general lien on the 1986 crop by virtue of the language in the printed security agreement, why attach the 1986 crop form at all? The Bank certainly attached significance to it and asserted it was part and parcel of the November 19, 1985 security agreement, and the Court in strictly construing this document against the Bank cannot believe it deemed the subsequent attachment of the 1986 crop form to be so-much surplus-age. A legal argument could be made that it was attached to comply with the description requirements as to on which real es *958 tate the crops were growing to comply with the Indiana UCC; however, this was never expressed by Fehrenbach as his reason for attaching the same. Fehrenbach admitted that the Debtors refused to sign the November 19, 1985 commitment letter, which stated that a condition of the commitment was that the Debtors grant the Bank a lien on the 1986 crops.
No additional monies were advanced by the Bank for input expenses on the 1986 crop and the maturity date of the November 19, 1985 note is April 14, 1986, or prior to when the 1986 crop would be in existence and in turn the proceeds of the crop would not be available to liquidate the note on maturity. It is certainly unusual for a farmer to collateralize his forthcoming crop when no monies for input expenses would be available to him to plant, grow and harvest the same.
Fehrenbach admitted that the other documents were not in fact attached or stapled to the November 19, 1985 printed security agreement when it was executed by the Debtors, including the 1986 crop program form, and that this was accomplished later by Fehrenbach at the Bank without the Debtors’ presence. Greives stated he never did get a copy of the purported complete security agreement with all of the attachments.
The typing in the “security” section of the November 19, 1985 note as to the last half of the word “Agreement” and “Dated 11/19/85 (crops)” is typed in with a typewriter different than the typewriter used for the other blanks on the form, and raises substantial questions in this Court’s mind as to when this was done and whether it reflected the intentions of both parties. If this phrase had been typed in before the note was signed why would it have been done on a different typewriter than the one that was used to type the rest of the note?
The Bank was not free to summarily assemble in an ex parte fashion a “do-it-yourself” security agreement, post-execution, by adding various attachments with neither the express authorization of the Debtors, nor was there implied authorization based on their conduct, and although unilaterally or subjectively the Bank deemed the attachments as necessary, the Debtors had not clearly agreed thereto. The documentation was done in a sloppy, unprofessional, after-the-fact manner, and the security alleged to have been granted is contrary to Greive’s testimony as to how he perceived the transaction, i.e. his contractual intent at the time of execution. Upon having had an opportunity to observe the witnesses, the Court finds Greives’ testimony to be credible and reasonable as to his intention regarding the collateralization of the 1986 crop. He freely admits executing the security agreement (without the attachments) but asserts he was under the impression this was merely a renewal of the November 19, 1985 note. Because of the patchwork manner in which the November 19,1986 security agreement was assembled post-execution, and the fact that the attachments were annexed by the Bank after its execution, its meaning is certainly ambiguous as the Bank itself is asserting that all of the attachments form one integrated security agreement and thus reasonable men can certainly differ as to the meaning thereof. Parol evidence, extrinsic circumstances, and the course of dealing between the parties is thus admissible and can be considered by the Court as to the contractual intention of the parties. (The Court here is referring to the underlying contractual intent at the time of its execution by the Debtors as to the crops vis a vis the security agreement itself). The Bank has failed to meet its burden by a fair preponderance of the evidence that there was a meeting of the minds, and that the Debtors intended to grant a security interest in the 1986 crops. Although the Bank may have unilaterally perceived this as a necessary facet of the agreement, this is not enough to form a binding security agreement by the Debtors.
Greives declined to sign the November 19, 1985 commitment letter which asked him to grant a lien on the 1986 crops. He was not asked to sign the Bank’s 1986 crop form as he was asked to do as to the 1985 crops. Despite this fact, the unsigned 1986 crop form was later attached to the Novem *959 ber 19, 1985 security agreement by the Bank after the same was signed by the Debtors. Why was this unsigned form as to the 1986 crop attached by the Bank post-petition if the Bank deemed itself fully secured as to the 1986 crop by virtue of the general language in the first page of the printed security agreement? The Debtors were not asked to execute a UCC-1 financing statement for the 1986 crops as they were for the 1985 crops although Fehren-bach stated it was standard Bank policy to require the same. The November 13, 1985 conversation between the Debtors and Feh-renbach touched on the Debtors’ 1986 crop projection, but no conversation was had whereby any intention was evinced that the Debtors were to grant the Bank a lien in the 1986 crops prior to the execution of the November 19, 1985 security agreements. Greives stated he only discussed the November 19, 1985 commitment letter from the Bank with Fehrenbach after the security agreement was signed.
Although the Bank’s loan committee notes and its commitment letter indicates a unilateral desire by the Bank to obtain a lien on the 1986 crops, this is not enough to contractually bind the Debtors. The Debtors must have also expressly indicated their intention to do so. The fact that Greives freely admitted he signed the printed security agreement which had the boilerplate language granting the Bank a security interest in the 1986 crops is not sufficient to bind the Debtors because, as noted above, the printed form together with the attachments which were admittedly annexed post-execution by the Bank, render the document ambiguous and thus par-ol evidence is admissible to explain the true intention of the parties.
Having had an opportunity to observe the witnesses, the Court finds the testimony of Greives to be more credible, reliable and reasonable than that of Fehrenbach and thus concludes that the Debtors had no contractual intent to grant a lien in the 1986 crops.
It should also be noted that the Debtors were never provided with what the Bank alleges to be the complete security agreement between the parties, i.e. the printed form with all of the attachments which were subsequently annexed by Fehrenbach after the executing by the Debtors of the printed form, and Greives testified that only after consulting with his counsel on July 3, 1986, was he made aware that the Bank claimed a security interest in his 1986 crops.
As pointed out by the Court in Rempa v. LaPorte Production Credit Association, 444 N.E.2d 308, 311 supra, although the security agreements themselves may indicate an objective indication to create a security interest and may pass the statute of frauds requirement of Indiana Code 26-1-9-203, this Court as the fact finder, may consider parol evidence and extrinsic circumstances and make the further inquiry as to whether the parties actually intended to create a security interest. Based upon the parol evidence adduced as discussed, and the circumstances surrounding the execution of the security agreement, the Court finds that the Debtors manifested no express intention to grant the Bank a security interest in the 1986 crops. Accordingly, the Court holds that the Bank does not have a security interest in their 1986 crops or the proceeds thereof.
As a consequence, the Court finds that the indebtedness of the Debtors to the Bank is secured by only their equipment and those specific cattle set out on the first page of the typewritten list attached to the July 18,1985 and November 19,1985 security agreements, their real estate, the 1979 Chevrolet truck, the 1976 Buick Electra automobile, and the 1972 Wilson trailer.
The Court now turns to the issue of what adequate protection, if any, must be provided by the Debtors to the Bank as to the above security.
The Bank’s motion requests relief from the automatic stay. 11 U.S.C. § 362. Subsection (d) thereof sets out when relief from the stay shall be granted.
It states:
[ (d) ] On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such *960 as by terminating, annulling, modifying, or conditioning such stay—
(1) for cause, including the lack of adequate protection of an interest in property of such an interest; or
(2) with respect to a stay of an act against property under subsection (a) of this section, if—
(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization....
11 U.S.C. § 363(e) is also relevant to these proceedings as it provides as follows:
[(e)] Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee (here the debtor), the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.
11 U.S.C. § 362(g) and § 363(o) relates to the burdens of proof the respective parties have on the issue of adequate protection. 11 U.S.C. § 362(g) provides:
[(g)] In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
(1) The party requesting such relief has the burden of proof on the issue of the debtor’s equity in property; and
(2) The party opposing such relief has the burden of proof on all other issues.
11 U.S.C. § 363(o) states:
[(o)] In any hearing under this section—
(1) The trustee (here the debtor) has the burden of proof on the issue of adequate protection; and
(2) The entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.
Thus, the Bank has the burden of proof (or risk of non-persuasion) to show that its security agreement is valid, i.e. that a genuine, authentic and binding agreement was entered into between the Debtors and in whereby the Debtors granted to it a security interest; that the agreement has priority, i.e. that it is prior to other competing liens or interests, if any; and, the extent of the lien, i.e. what property is subject to the security agreement or what amount of the secured parties’ claims is secured by the property in question.
Because of the priority nature of an adequate protection proceeding as mandated by the Code (11 U.S.C. § 362(e) and Bankruptcy Rule 4001, it is quite often not feasible to enter a final dispositive order based on the adequate protection hearing, as to all of the often complex issues that arise relating to the validity, priority or extent of liens when affirmative defenses on counterclaims are raised by the Debtor. Although a res judicata determination of these issues at this stage of the proceedings is often inappropriate, it is possible and sometimes necessary. See, e.g., First Nat’l Bank of Denver v. Turley, 705 F.2d 1024, (5th Cir.1983). However because of the priority and summary nature of the adequate protection proceedings these matters are usually segregated and heard separately. See, In re High Sky, Inc., 9 C.B.C.2d 1291, 1296-97 (Bankr.M.D.Pa.1981).
In addition, Bankruptcy Rule 7001(2) requires that an adversary proceeding be instituted to determine the validity, priority, or extent of a lien or other interest in property.
However, because of the underlying issues raised as to the validity of the Bank’s security interest as to a substantial portion of the Debtors’ estate the Court was compelled to enter a dispositive order on those issues as that decision in turn has a major impact on the amount of adequate protection the Debtors must pay the Bank. Thus, the Court for the purposes of this adequate protection order only, will make a finding as to the validity, extent and priority of the Bank’s lien. This order will not preclude either party from subsequently litigating the issue relating to third parties, e.g. the Bank or the Debtors may proceed with an adversary proceeding versus the John Deere Company or Farmers and Mer *961 chant’s Bank at a later date pursuant to Bankruptcy Rule 7001(2) to determine the same.
11 U.S.C. § 361 enumerates the various methods of providing adequate protection, none of which are exhaustive or exclusive. 11 U.S.C. § 361 as follows:
When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity’s interest in such property;
(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity’s interest in such property; or
(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity’s interest in such property.
11 U.S.C. § 361.
11 U.S.C. § 362(d), set out above, states that the automatic stay shall be vacated or modified for cause such as the failure to provide adequate protection to the secured creditor. 11 U.S.C. § 361 enumerates certain, non-exclusive methods for providing adequate protection. Subsection 1 sanctions cash payments or periodic cash payments. Thus, this Court may order cash payments by the Debtor to the creditor as adequate protection of the secured creditor’s interest. By issuing such an order, this Court satisfies 11 U.S.C. § 362(d)(1).
Adequate protection is a question of fact. In re Martin, 761 F.2d 472 (8th Cir., 1985). As stated by that court at page 474:
Upon reviewing the legislative history, we agree with the line of cases that have held that adequate protection is a question of fact. The concept of adequate protection was designed to “insure that the secured creditor receives the value for which he bargained.” S.Rep. No. 989, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5839 (emphasis added): see also H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 6295. Congress explicitly permit the courts to adapt to varying circumstances and changing modes of financing, and that such matters “are [to be] left to case-by-case interpretation and development.” H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295; see also S.Rep. No. 989 at 54, 1978 U.S. Code Cong. & Ad.News at 5840. Because Congress intended that value was to be determined on a case-by-case basis, permitting the debtors “maximum flexibility in structuring a proposal for adequate protection.” In re American Mariner Industries, Inc., 734 F.2d 426, 435 (9th Cir.1984).
This is to be distinguished from the question of what creditor interests are to be incorporated in the scope of adequate protection which is a question of law. In re Briggs Transportation Company, 780 F.2d 1339, 1342 (8th Cir.1985).
Certainly, the question of whether adequate protection be granted or what should be granted as adequate protection for the decrease in the value of any entity’s interest is the debtor’s property arising out of the use thereof by the debtor as a consequence of the- automatic stay is not new or novel to the bankruptcy courts across the country or the bankruptcy courts in this district since the enactment of the 1978 Bankruptcy Code. The Code itself, the legislative history, and the numerous cases interpreting the same are fairly harmonious in requiring adequate protection payments by the debtor to at least the un-dersecured creditor to compensate such a creditor for the decrease in the value of the collateral arising out of the use thereof by *962 the debtor. See generally, Annot. 66 ALR Fed. 505 (1984); 2 Collier on Bankruptcy, ¶ 361 (361-1), ¶ 362 (362-47) and (1363.06 (363-26) (L. King, 15th Ed.); and 2 Bkr.L. Ed., Code Commentary and Analysis, Chapter 15, § 361 (Lawyer’s Coop. 1983 Revision). However, there has arisen recently a growing body of law that holds that not only is a secured party entitled to adequate protection for the decrease in value of property resulting from the use thereof by the debtor, but the secured party is also entitled to adequate protection for its loss of present economic value and its secured interest in the debtor’s property, i.e. the right of the secured creditor to take possession of and sell the collateral on the debtor’s default. The suspension of the creditor’s remedies must be adequately protected. See, Grundy National Bank v. Tandem Mining Corporation, 754 F.2d 1436 (4th Cir.1985); In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir. 1984); In re Deeter, 53 B.R. 623 (Bankr.N.D.Ind.1985); In re Bear Creek Ministorage, Inc., 49 B.R. 454 (Bankr.S.D.Tex. 1985). In this district, see, In re Sculley Trucking, Case No. 85-60789 (Bankr.N.D.Ind. October 15, 1985) (J. Lindquist, unpub. opin.) [Available on WESTLAW, 1985 WL 11528]; Matter of Phebus, Case No. 85-30089 (Bankr.N.D.Ind. September 16, 1985) (J. Rodibaugh, unpub. opin.) [Available on WESTLAW, 1985 WL 11529]; Matter of Robert Lee Farms, Inc., Case No. 84-30894 (Bankr.N.D.Ind. March 21, 1985) (J. Rodibaugh, unpub. opin.); Matter of Langley, 30 B.R. 595 (Bankr.N.D.Ind.1983).
This Court has generally endorsed the Ninth Circuit’s Opinion in American Mariner, supra. See, In re Sculley Trucking, Inc., Case No. 85-60789, (Bankr.N.D.Ind. October 15, 1985) (J. Lindquist, unpub. opin.). Thus, at least an undersecured creditor is ordinarily entitled under the concept of adequate protection to be compensated for the delay in enforcing its rights against the collateral arising out of the automatic stay so as to provide the secured creditor with the “indubitable equivalent” of its bargained-for-rights. That is, the secured creditor's right to take possession of and liquidate the collateral on the debt- or’s default by virtue of its security agreement is an interest in property that has substantial and measurable value. Therefore, the concept of adequate protection does not relate only to protecting the secured creditor as to the decrease in value of the collateral arising out of the use thereof by the debtor, but in addition, this Court “must recognize and protect the value of a creditor’s interest when, as here, that value is demonstrated to exist and is measurably threatened.” American Mariner, 734 F.2d at 432. (Emphasis supplied).
The Court is well aware of two subsequent cases that discussed the American Mariner case in great detail. The first is In re Briggs Transp. Co., 780 F.2d 1339, 1351 supra, which held that a secured creditor is not always entitled as a matter of law to compensation in every instance for the delay in enforcing its foreclosure rights during the interim period between the filing of the petition and the confirmation of the plan, and what constituted adequate protection is a question whose resolution is best left to the knowledge and expertise of the bankruptcy court. This decision does not necessarily conflict directly with American Mariner. Id. at 1350 N. 12. The second case is In re Timbers of Inwood Forrest Associates, Ltd., 793 F.2d 1380, 1416 (5th Cir.1986) Panel opinion reinstated en banc, 808 F.2d 363 (5th Cir.1987). There the Court held that 11 U.S.C. § 361(3) does not require periodic postpetition interest payments to an undersecured creditor to compensate it for the delay of the reorganization proceeding during the pendency of the automatic stay.
This Court was not called upon to decide this legal issue by the parties. The Court only holds as the law of this case that the Bank as an undersecured creditor has the right to “lost opportunity costs” pursuant to American Mariner based on the facts and circumstances of this case.
In applying the American Mariner doctrine, supra, the Court must determine what the secured creditor could hypothetically receive if it repossessed the collateral, sold it, and used the net proceeds to make other loans. The Court must first how *963 ever, make a determination if the secured creditor is oversecured or undersecured. If the secured creditor is undersecured adequate protection payments are normally necessary by the debtor to keep the stay in effect which under American Mariner ordinarily includes the loss in the value of the secured creditor’s interest in the collateral. The loss in value is the interest income the creditor would have received if the net proceeds of the collateral were again available to the secured creditor to be loaned out again in the existing commercial setting. The Court may thus order that periodic adequate protection payments be paid by the debtor to the undersecured creditor at a rate which would compensate that creditor for the loss of its “opportunity costs.” That is, the rate of interest the creditor could expect to earn on its money from the date the net proceeds from the sale of the collateral by virtue of realizing on its lien would hypothetically be available to it. (For lack of a better term these payments are referred to herein as “interest”.)
In the case at bar, the initial and most crucial question is whether the Bank is oversecured or undersecured pursuant to 11 U.S.C. § 506(a), i.e. is the value of the equipment, specific cattle and real estate in excess of the Bank’s unpaid balance or is the value less than the Bank’s unpaid balance. If the Bank is clearly undersecured, the Debtors must normally provide adequate protection to the Bank to keep the automatic stay in effect in two respects. First, for the decrease in the value of the collateral as a result of the use thereof by it and, secondly, for the “lost opportunity cost” that the Bank is precluded from receiving by being unable to liquidate or realize on its collateral and using the net proceeds thereof by foreclosing its security interest in the collateral. The stipulated value of the non-titled equipment subject to the Bank’s lien is $63,500.00. In addition, credible evidence indicates that the value of the 1976 Buick Electra is $700.00 and the 1979 Chevrolet truck has a value of $3,200.00. Thus the total value of all of the titled and non-titled equipment totals $67,400.00. The principal balance and accrued interest due the Bank on the date of the Debtors’ petition is approximately $370,716.12, and thus the Bank is clearly undersecured even after considering the real estate and specific cattle as discussed below. Accordingly, adequate protection must be afforded by the Debtors to the Bank to keep the stay in effect.
This is used and some what older equipment which appears to be well-maintained and thus has a rather substantial remaining useful life. Fehrenbach stated that the useful life of the equipment was seven to ten years. Thus, the Court finds for the purposes of this hearing only, that the Debtors’ equipment has a remaining useful life of ten years and accordingly the equipment subject to the Bank’s lien will depreciate in value on a straight-line basis at the rate of $6,740.00 a year, i.e. the value of the equipment divided by the estimated remaining useful economic life thereof. The Court did not take into consideration salvage value as no evidence was submitted on this point.
As a consequence the Debtors must make periodic monthly payments to the Bank for this decrease in the value resulting from the Debtors’ use thereof in the sum of $561.67 per month and each month thereafter until the Debtors’ plan is confirmed or this case is dismissed or converted. This monthly payment amount is based on the annual straight line depreciation of $6,740.00 divided by twelve months.
As to the second facet of adequate protection, i.e. the right of the Bank to its “lost opportunity costs” pursuant to American Mariner, supra, the Court must deduct the costs and expenses of the Bank in taking possession of the equipment from the hypothetical gross sale proceeds to reach a net liquidation value.
Finally, in determining when the adequate protection payments should begin for “lost opportunity” costs, the Court must take into consideration the period of time it would take the Bank to obtain possession of the equipment and sell the same.
The Court finds that Fehrenbach’s estimate as to the expenses of sale is reasonable. Accordingly, the Court will de *964 duct from a projected gross sales price of $67,400.00, a 5% auctioneer’s commission or $3,370.00 plus 3% for sales preparation such as repairs and cleaning or $2,022.00 leaving projected net proceeds of $62,-008.00.
Fehrenbach also stated the collateral could be sold in sixty days. The Court finds this figure appears to be reasonable and thus finds that it would take sixty days to consummate the sale of the equipment.
The Court further finds that the present blended rate of return on investments and loans of 10.601% is credible and feasible based on current market.
Accordingly the Debtors must also pay to the Bank 10.501% per annum on the sum of $62,008.00 as “lost opportunity costs” or the sum of $6,511.46 in “interest” annually, payable in equal monthly installments of $542.62 until the Debtors’ plan is confirmed in this case or is converted or dismissed.
The question remains as to what date is to be used as the starting point for computation of “interest” as to the American Mariner facet of adequate protection. Should it be the date of the filing of the petition, the date the Bank first requested relief from the stay, the date of the final evidentiary hearing, or, the date of this Court’s opinion? It is clear that the Bank’s right to foreclose brings it no actual financial benefits until the sale of collateral is made to a third party, and it has realized the net proceeds of its collaterals. Thus interest payments need not begin until that date. There appears to be a split of authority on the question of the beginning period for the computation of interest. First, the Ninth Circuit in American Mariner, supra, states: “We hold that Crocker National Bank is entitled to compensation for the delay in enforcing its right during interim between the petition and the confirmation of the plan” American Mariner, 734 F.2d at 435. (Emphasis supplied). Presumably, “the petition” referred to by the Ninth Circuit is the petition filed to commence the case under Title 11. See, Bear Creek, 49 B.R. at 458-59, N. 11.
The Fourth Circuit in Grundy, supra, apparently disagrees. It states:
We also consider the beginning period for the computation of interest. Interest should not begin any earlier than the time that the creditor petitions for relief from the automatic stay. Even then the timing of interest should be postponed to take account of the time that would be consumed in repossession and sale of the collateral.
Grundy, 754 F.2d at 1441.
Judge Rodibaugh, of the South Bend Division of this Court, in a recently issued opinion of Matter of Phebus, supra, has adopted the Mariner view. He states:
Finally, the court must determine the applicable hypothetical foreclosure and reinvestment date in order to compute the date of the evaluation of the property and for the determination of the interest rate. This date would also be the date on which the payments would begin. Looking to American Mariner, the objective is to compensate for the denial of the right to foreclose. That denial arises upon the entry of order for relief which coincides with the filing of the case. The applicable date for evaluation of the property and for the determination of the interest rate would be calculated by adding the foreclosure delays to the date that the bankruptcy petition was filed. See, American Mariner, 734 F.2d 426, 435 footnote 12. The date so computed composts with American Mariner and would be the earliest date on which the bank could expect a return on its interest in the property.
Phebus, Case No. 85-30089, page 10.
It is noted that Phebus involved unimproved real estate subject to a real estate mortgage. Since Indiana foreclosure law would normally entail at least six months' from the date of foreclosure to the date of the hypothetical sheriff’s sale, Judge Rodi-baugh, we think, correctly deferred interest payment until six months after the case was commenced. As noted above, no evidence or arguments were submitted to the Court on this issue. However, since this case involves tangible personal property *965 and the rights and remedies of the respective parties under the Indiana Uniform Commercial Code the standard in Phebus is clearly not applicable. Here, the Court will defer the accrual of interest to two months after the date on which the Bank obtained a prejudgment order of possession in the state court on June 25, 1986 or August 24, 1986 inasmuch as the Court finds that this would be the earliest time that from a practical standpoint the Bank could have actually realized on its collateral under the Indiana Uniform Commercial Code I.C. 26-1-9-501 et.seq., but for the automatic stay. Any accumulated arrearage on the interest from August 24, 1986 may be prorated by the Debtors and be paid over the next four (4) regular monthly payments as ordered below.
An argument based on pure logic certainly could be made that the adequate protection payments for decrease in the value of the collateral should be computed from the date that the Debtors filed their petition commencing their case, because the Debtors are using the collateral of the Bank from that date and decreasing the value thereof while the Bank is prohibited from enforcing its lien versus the collateral because of the automatic stay. However, nowhere in the Bankruptcy Code (other than 11 U.S.C. § 363(c)(2) dealing with cash collateral) is the debtor prohibited from using the collateral in the ordinary course of his business until adequate protection is offered the creditor. On the contrary, 11 U.S.C. § 363(e) states that on the request of an entity, i.e. a motion by the secured creditor, the Court shall prohibit or condition use as is necessary to provide adequate protection. Thus, there is imposed upon such a secured creditor the obligation to be diligent in requesting adequate protection. There appears to be no equitable basis in awarding a secured creditor adequate protection from the date the case is commenced when the burden is on the creditor to affirmatively assert its rights to adequate protection by motion. On the other hand, once the motion is filed, 11 U.S.C. § 362(g) and § 363(o) places the burden of proof on the debtor on issue of adequate protection. In addition, to the above provisions, there are certain policy considerations that should be noted. The secured creditor should not be allowed to file an adequate protection motion and obtain an order that would require substantial adequate protection payments retroactively, thus burdening the debtor with a large arrearage which may defeat the debt- or’s ability to formulate a plan. In addition, the stay issued under 11 U.S.C. § 362 is designed to give the debtor a brief “breathing spell” so that it can put its affairs in order and propose a plan. If the adequate protection payments for decrease in value by post-petition use of the collateral by the debtor were to be required retroactively to the date of the commencement of the case, this brief respite intended by 11 U.S.C. § 362 would be vitiated. See, Bear Creek, supra, 49 B.R. at 458, N. 9. Awarding depreciation from the date of the petition seems unduly harsh, burdensome and detrimental to the goal of Chapter 11 bankruptcy, that being, a successful reorganization. Thus, any accrued depreciation shall be computed from the date of the final hearing or November 3,1986 and may be prorated by the Debtors over the next four (4) monthly payments to the Bank.
No evidence was adduced by the Bank that, at least in the short term, the remaining cattle which are subject to the Bank’s security interest will be decreasing in value arising out of their use and possession by the Debtors which would require the payment of adequate protection pursuant to § 361. In fact Fehrenbach testified that if the cattle were to remain in the Debtors’ possession over the short term they would actually increase in value. Although over an extended period of time the increased age and the concomitant change in the physical condition and thus the marketability and breeding ability of the cattle might effect their ultimate resale value, their present use and possession by the Debtors does not indicate any material incidence of “depreciation” as would be characteristic of tangible equipment used in the day to day operations of a manufacturer where it is subject to inevitable wear and tear no *966 matter how well it is maintained and repaired.
As a matter of fact, the Debtors are perforce compelled to take all the necessary and proper steps to insure on a day-today basis that the cattle are properly housed, fed and given proper veterinary care or their prospects for reorganization will be diminished considerably. The Debtors are experienced and skilled in these tasks and are clearly in a better position to attend to these, duties than the Bank and certainly in just as good a position to do so as any third party that the Bank might retain to perform those functions if it was granted possession of the cattle pending their ultimate liquidation. In fact, since the Debtors have a vested ownership interest in said cattle and are attempting to effect a plan of rehabilitation rather than one of liquidation, their best interests, and in turn the best interests of the Bank, are served by maintaining the value of these cattle and it is possible that the value of the cattle could in fact increase in value while in the Debtors' possession.
In protecting their interests in the cattle and maintaining their value the Debtors will be compelled to expend their own funds to pay for the numerous expenses incurred by the Debtors in caring for these cattle. AH of these on-going expenditures necessarily benefit the Bank also as they go to maintaining or increasing the value of its collateral during the pendency of this proceeding.
This case does not involve the attempted use of cash collateral by the Debtors to care for the cattle inasmuch as the Bank does not assert a lien in the Debtors’ receivables or contract rights and the Debtors are expending their own unencumbered funds to care for the cattle. Nevertheless, the thrust of the Court’s opinion in In re Vanas is helpful. There, the debtor requested the permission of the Court to use cash collateral in the form of milk proceeds to continue operating their farm. The creditor, PCA, which had a lien on the milk proceeds, as well as the debtor’s equipment, livestock and crops moved to vacate the stay pursuant to § 862(d). The Court held that as long as the cows were fed and maintained in number and replaced as necessary and their value appeared to appreciate, and so long as there was no substantial abuse and the cows were adequately insured, PCA’s security interest in the livestock was adequately protected. In re Vanas, 50 B.R. 988, 998-1002 (Bankr.E.D.Mich.1985). The Court allowed the debtors to use the cash collateral for their operation and denied the motion by PCA for adequate protection citing Dahlquist v. First National Bank of Sioux City, Iowa, 40 B.R. 969 (D.S.D.1983) aff'd in part and appeal dismissed in part, 737 F.2d 733 (8th Cir.1984), later proceeding, 751 F.2d 295 (8th Cir.1985), and In re Stein, 19 B.R. 458 (Bankr.E.D.Pa.1982).
In Dahlquist, the District Court held that where the cattle were being fed and crops were being irrigated and cared for, both of which were subject to security interest, it was in the best interests of all parties that the debtors continue to do so until the cattle were marketable and the crops harvested and allowed the use of cash collateral. Dahlquist v. First National of Sioux City, Iowa, 40 B.R. 969, 971, supra.
In Stein, the Court held that the un-dersecured creditor who had a lien in the debtor’s livestock and equipment was not harmed in that the herd continued to reproduce and the value of the debtor’s crops increased by the use of the cash collateral and thus the debtor was allowed to use the cash collateral. In re Stein, 19 B.R. 458, 460, supra.
As noted previously, this case does not involve the use of cash collateral. Nevertheless, the Debtors here are injecting their own funds into the care and maintenance of the cattle and the Court fails to perceive where the Bank’s collateral is in any way decreasing in value as a result of the use and possession thereof by the Debtors is so that the Bank is entitled to adequate protection on that basis.
This does not mean however, that the Debtors need not pay adequate protection whatsoever to the Bank which is clearly undersecured. The Debtors must make *967 adequate protection payments to protect the Bank’s interest in the collateral pursuant to its security agreement, i.e. its right to liquidate the collateral or the right to “lost opportunity” costs pursuant to American Mariner, supra caused by the delay in enforcing its rights due to the automatic stay.
It is not clear from the evidence however, based on the Court’s opinion as to what specific cattle and their offspring, if any, the Bank has a security interest in nor their specific value. Accordingly, the Bank shall be permitted to enter upon the premises of the Debtors during regular business hours upon twenty-four hour prior notice to the Debtors’ counsel to specifically identify and appraise the cattle in which they have a security interest pursuant to this opinion. In the event that the Bank and the Debtors fail to stipulate as to the specific cactle subject to the Bank’s security interest and as to the net liquidation value and lost opportunity cost thereof to the Bank, either party may petition this Court to determine the same.
In addition, the Debtors should not be allowed to sell or otherwise dispose of any of their cattle or their offspring, even if said disposition were deemed in the ordinary course of business, unless prior court approval is obtained after due notice to the Bank. This includes all cattle whether specifically subject to the Bank’s security interest or not. The adequate protection to the Bank, who is greatly unsecured, requires that the value of their cattle remain at the present level.
The Debtors must also permit physical inspection of all their cattle by the Bank on a periodic basis and allow the Bank to inspect and copy all pertinent books and records maintained by the Debtors regarding said cattle.
The Bank shall be granted an additional lien in any and all offspring of their cattle and any cattle acquired by the Debtors post-petition and their offspring pursuant to § 361(2) to protect the Bank’s interest to the extent that the Debtors fail or refuse to make the adequate protection payments ordered herein, including the payment of insurance and taxes.
In the event that the payments are not made, and additional lien is not sufficient to protect the Bank’s interest, the Bank shall be entitled to a super-priority administrative claim against the Debtors’ estate pursuant to § 507(b).
If the Bank’s examination of the cattle subject to the Bank’s security interest reveals that they are in fact declining in value as a result of the use and possession thereof, the Bank is hereby given leave to file a second motion for relief from stay based on a material change in circumstances.
The Court now turns to the Debtors’ real estate and the issue of adequate protection.
The Court finds the testimony and appraisal report of Jones, the Bank’s- expert witness, to be credible and reasonable and thus finds that the value of the Debtors’ real estate for the purposes of this hearing only is $691,899.00. The total acreage comprised of two tracts owned by the Debtors’ is 633.255 acres of which Jones deemed 345.8 acres to be tillable.
The contributory value of the improvements on tract # 1 as set out in Jones’ written report (Defendant’s exhibit no. 31 as amended on September 23, 1986) totals $153,422.00 of which $76,600.00 was allocated to the Debtors’ principal residence located thereon. The contributory value of the improvements on tract # 2 was placed at $79,712.00 per Jones’ written report with $45,893.00 of that figure being attributable to the house located thereon.
Thus, based on the foregoing figures the value of the raw land is $458,765.00 ($691,-899.00 total value less $233,134.00 as the combined contributory value of the improvements on tract # 1 and tract # 2).
Jones estimated the replacement cost of all improvements in tract # 1 as being $300,082.00, while he estimated the replacement cost of all improvements on tract # 2 as being $205,210.00.
The Court finds that the contributory values assigned to the improvements by Jones as set out above to be a more reliable *968 and accurate assessment of their true value when the total improvements and all the raw land are considered together as a whole or as one marketable unit rather than valuing the separate improvements individually on a reproduction cost or market data (comparable sales) approach.
The principal balance due John Hancock on the date of the Debtors’ petition, July 3, 1986, was $430,000.00. In addition, pursuant to the complaint filed by John Hancock in the state court, to which the parties stipulated as to its accuracy to determine the extent of John Hancock’s first lien position, the accrued pre-petition interest due and owing by the Debtors as of March 30, 1986 was an additional $30,398.61 with interest accruing at the rate of ten (10) percent per annum thereafter which comes to a per diem of $117.81 a day based upon a 365 day year. Thus, on the day the Debtors filed their petition, they were indebted to John Hancock in the principal sum of $430,000.00 plus $42,650.66 in accrued interest for a total of $472,650.66. Because the Court has found the value of the real estate to be $691,899.00, John Hancock as a first lienholder is oversecured and its secured claim continues to accrue interest at the contract rate of 10% per annum pursuant to 11 U.S.C. § 506(b).
The principal balance and accrued interest due and owing to the Bank as of the date of the Debtors’ petition was $370,-716.12. Thus, when the first mortgage balance to John Hancock is added to that of the Bank, it is clear that the Bank is un-dersecured based on a valuation of $691,-899.00 even after adding in the value of the equipment and the projected value of the specific cattle. Pre-petition interest will thus not accrue on the Bank’s claim pursuant to 11 U.S.C. § 506(b). The Bank’s lien interest is in the equity cushion that John Hancock enjoys, i.e. on the date of the Debtors’ petition the Debtors owed John Hancock $472,650.66 while the value of the real estate is $691,899.00 leaving a gross equity or value above the first mortgage balance of Hancock of $219,248.34 upon which the Bank has a second lien and upon which the Bank could theoretically realize by paying off John Hancock’s first mortgage on foreclosure. Inasmuch as the Bank has a principal balance of $370,716.12 and the equity over the first mortgage to John Hancock was only $219,248.34, on the petition date the Bank is clearly underse-cured, and the Debtors must also pay adequate protection to the Bank in order to keep the stay in effect as to the real estate.
In computing the Bank’s net lost opportunity costs pursuant to American Mariner, supra, as to the real estate, the Court will assume that but for the automatic stay that went into effect on the date of the filing of the Debtors’ petition, a foreclosure sale could have been held on October 24, 1986, i.e. the foreclosure complaint was filed by John Hancock on April 24, 1986, and pursuant to Indiana law a foreclosure sale could have been held as the normal course of events six months later. At that time, the Debtors would have owed John Hancock the principal sum of $430,000.00 plus $51,952.84 interest ($30,398.61 accrued as of March 30, 1986 plus 10% per annum or a per diem of $117.01 a day thereafter through October 24, 1986 or $21,559.23) for a total of $481,-957.84. To this would have to be added the reasonable attorneys’ fees that would have been incurred by John Hancock and awarded by the state court in prosecuting the foreclosure. The Court finds for the purposes of this hearing that these fees would be at least $10,000.00. Thus, the total amount that the Bank would either have to pay to either purchase John Hancock’s senior position or it would have to bid in at sheriff’s sale to avoid having its secured mortgage foreclosed out would be $491,-957.84. Assuming a gross value of $691,-899.00, this would leave the Bank with the gross sum of $199,941.16, after liquidation of John Hancock’s senior lien. From this would have to be deducted the expenses incurred by the Bank in selling the property after purchasing the same at sheriff’s sale. (The Court does not assume that a third party would actually bid in cash at the sheriff’s sale for the full value of the property so that the Bank would receive its monies over and above the first mortgage balance at that time. The Bank as a rea *969 sonable prudent lender would protect its second lien interest by bidding at the sheriffs sale and then attempt to market the real estate in an orderly fashion to obtain the best price.) Bear Creek, supra, 49 B.R. at 457.
From the sum of $199,941.16 must be deducted the costs of selling the real estate to a third party for $691,899.00 that would be incurred by the Bank. The Bank’s appraiser estimated that the Bank would incur a real estate commission of five percent. To this the Court will add an additional one percent for miscellaneous expenses, closing costs and prorations for a total of six percent. This totals $41,513.99, leaving the hypothetical net proceeds that would have been available to the Bank of $158,427.17.
The Bank’s appraiser estimated that if a broker were engaged to resell the real estate after purchase at the sheriff’s sale, the property could be sold in three months and that the sale could be closed one month thereafter. Thus, based on this unrefuted testimony of Jones which the Court finds to be reliable and credible, the Bank would have hypothetically obtained the net proceeds of the real estate or $158,427.17 on or about February 24, 1987.
As discussed supra, the Court had already found Fehrenbach’s testimony that the blended return on the Bank’s loans and investments of 10.501% to be reasonable. Thus, the Debtors must pay to the Bank on an annual basis the sum of $16,636.44 ($158,427.17 X 10.5017%) as the Bank’s lost opportunity costs pursuant to American Mariner, supra. These payments would begin to accrue on the hypothetical sale date or February 24, 1987. On a monthly basis this annual sum would be payable at the rate of $1,386.37 a month.
The second facet of adequate protection is that the Bank must be compensated for the decrease in the value of the value of the real estate as a result of the Debtors’ use and occupancy thereof while the automatic stay is in effect. Of course, raw land itself is not depreciable and thus, since the Court has found the total value of the real estate to be $691,899.00, and the attributable value of all the improvements to be $233,134.00, the value of the Debtors’ raw land is $458,765.00.
The $233,134.00 attributable value of the improvements is an aggregate figure and it is difficult for the Court to separate out the depreciable life of the various components in order to arrive at an accurate annual figure for overall depreciation.
Jones testified that the main house was well built, had enjoyed average maintenance, and should last 70 or 80 years or possibly longer. He also related that the useful life of the Morton barn, the sheds, and the grain and storage bins would be approximately forty years given normal maintenance and repair. Based upon Jones’ written report there are numerous other improvements such as two other houses wherein the useful life is not given.
Accordingly, for the purposes of this hearing only the Court will assign a useful life of seventy years to the main house which has a contributory value of $76,-618.00 and a useful life of forty years to the remaining improvements which have a contributory value of $156,516.00 {i.e. $233,134.00 in total contributory value less $76,618.00).
Thus, the Court finds that the annual decrease in the value of the main house on a straight-line depreciation basis is $1,094.54 {i.e. $76,618.00 divided by 70 years), and that the annual decrease in the value of all other improvements is $3,912.90 {i.e. $156,516.00 divided by 40 years). Thus, the Court finds that the total annual depreciation based upon the contributory value of the improvements is $5,007.44 {i.e. $1,094.54 plus $3,912.90). Payable on a monthly basis this would be $417.29 a month. Payments shall be effective on November 3,1986 or the date of the final hearing for the reasons discussed above. Any accumulated payments may be prorated over the Debtors’ next four monthly installments.
Finally, the security agreements provide that the Debtors pay all taxes and insurance relating to the collateral. It is the Court’s position that at a very mini *970 mum, regardless of other factors discussed in this opinion, the Debtors, when obligated to do so by the security instruments, must pay current taxes and keep the property properly insured. Unpaid taxes can become a lien by operation of law, which may have priority over every other interest including the Bank’s liens, and thus the failure to pay the same can erode the Bank’s interest in the property. The maintenance of insurance, of course, is extremely crucial so that the creditor may be properly protected from the various casualty risks attendant to property ownership and to insure that in the event that collateral is damaged or destroyed, the creditor is not left with a mere unsecured claim. See, In re Pond, 43 B.R. 522 (Bankr.D.M.D.1984); In re Mr. D. Realty Company, 27 B.R. 359 (Bankr.S.D.Ohio W.D.1983); In re Pittman, 7 B.R. 760 (Bankr.S.D;N.Y.1980); In re El Patio, Ltd., 6 B.R. 518 (Bankr.C.D. Calif.1980).
Therefore, as additional adequate protection, the Debtors shall procure a broad form casualty insurance policy from a reputable insurance carrier authorized to do business in the State of Indiana in an amount no less than the present value of the equipment, the cattle and any offspring of the cattle, and any improvements in the real estate, specifically setting out the collateral in question and showing the Bank as a loss-payee thereon, within ten (10) days from the date of entry of the Order and pay all taxes relating to the collateral from the date of the entry of this Order forward and provide the Bank with written proof thereof within ten (10) days after the final due date on which said tax bills are to be paid.
IT IS THEREFORE, ORDERED that the Debtors pay the Bank as adequate protection the sum of $561.67 a month for the decrease in the value of the equipment as a result of the use thereof by the Debtors effective November 3, 1986. Payments shall begin thirty (30) days from the date of this Order and shall be payable on the same date of each month thereafter until further order of the Court. Any arrears accumulated since November 3, 1986 may be prorated by the Debtors over the next four (4) monthly payments. And it is further
ORDERED that the Debtors pay the Bank as adequate protection the sum of $542.62 a month for lost opportunity costs incurred by the Bank relating to the equipment effective August 24,1986. Payments shall begin thirty (30) days from the date of this Order and shall be payable on the same date of each month thereafter until further order of the Court. Any arrears accumulated since August 24, 1986 may be prorated by the Debtors over the next four (4) monthly payments. And it is further
ORDERED that the Debtors pay the Bank as adequate protection for the decrease in the value of the improvements to the real estate as a result of the use thereof by the Debtors the sum of $417.29 a month effective November 3, 1986. Payments shall begin thirty (30) days from the date of the entry of this Order and shall be payable on the same date of each month thereafter until further order of the Court. Any arrears accumulated since November 3, 1986 may be prorated by the Debtors over the next four (4) monthly payments. And it is further
ORDERED that the Debtors pay the Bank as adequate protection for lost opportunity costs incurred by the Bank relating to the real estate the sum of $1,386.37 a month effective February 24, 1987. Payment shall begin thirty (30) days from the date of this Order and shall be payable on the same date of each month thereafter until further order of the Court. Any arrears accumulated may be prorated by the Debtors over the next four (4) monthly payments. And it is further
ORDERED that the Debtors permit the Bank, after reasonable prior notice to Debtors' counsel, to enter upon the Debtors’ premises and inspect all cattle situated thereon for the purpose of determining which specific cattle are subject to the Bank's security agreement pursuant to the terms of this Order and in the event the Bank and the Debtors cannot agree as to the net liquidation value thereof and the amount of lost opportunity costs payments *971 to be made by the Debtors to the Bank as adequate protection either party may move for this Court to hold a supplemental hearing on said issues. And it is further
ORDERED the Debtors provide proof of insurance and pay property taxes relating to said collateral as more fully set out herein. And it is further
ORDERED that the Debtors permit from time to time, after reasonable prior notice to Debtors’ counsel, any duly authorized representative of the Bank to enter upon Debtors’ premises and physically inspect and examine any and all of the Debtors’ cattle and their offspring, if any. And it is further
ORDERED that the Debtors, after reasonable prior notice to Debtors’ counsel, permit any duly authorized representative of the Bank to inspect and copy any and all books and records kept and maintained by the Debtors regarding said cattle. And it is further
ORDERED that the Debtors not sell or otherwise dispose of any of their cattle or their offspring, now owned or hereafter acquired whether they are subject to the Bank’s security interest or not, and whether said sale or disposition be in the ordinary course of business or not, without prior approval of the Court and upon due notice to the Bank. And it is further
ORDERED that pursuant to 11 U.S.C. § 361(2) the Bank shall be hereby granted an additional lien in any offspring of any and all of the Debtors’ cattle or cattle acquired by the Debtors post-petition and their offspring to the extent that the adequate protection payments, including insurance and taxes, are not made as ordered herein, and in the event that said replacement lien will not adequately protect the Bank’s interest, the Bank shall be granted a super-priority administrative claim against the Debtors’ estate pursuant to § 507(b) to the extent that the adequate protection payments are not paid as ordered herein. Said administrative claim shall not be in lieu of adequate protection as prohibited by § 361(3) but as additional protection to the Bank.

. This Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52 as made applicable by Bankruptcy Rules 9014 and 7052.